[No. B132448. Second Dist., Div. Four. Jan. 3, 2001.]

GOLDEN EAGLE REFINERY COMPANY, INC., et al., Plaintiffs and Appellants, v.
ASSOCIATED INTERNATIONAL INSURANCE COMPANY et al., Defendants and Respondents.

## COUNSEL

Zevnik Horton Guibord McGovern Palmer & Fognani, Paul Anton Zevnik, Michel Y. Horton, Meredith Newton, John K. Grossman and Elizabeth Miller for Plaintiffs and Appellants Golden Eagle Refinery Company, Inc., and American Ultramar Limited.

O'Melveny & Myers, John W. Stamper, Lori E. Romley and Michael M. Maddigan for Defendants and Respondents Century Indemnity Company and Central National Insurance Company of Omaha.

Barton, Klugman & Oetting and Charles J. Schufreider for Defendant and Respondent Pennant Insurance Company, Limited.

Lewis, D'Amato, Brisbois & Bisgaard, James D. Fraser, Jonathon Kaplan, Raul M. Martinez and Jeffry A. Miller for Defendant and Respondent Gerling-Konzern General Insurance Company.

Thelen, Reid & Priest, Brooks P. Marshall; Hancock Rothert & Bunshoft, Yvette D. Roland and Gina P. Mak for Defendant and Respondent The Yasuda Fire and Marine Insurance Company of Europe Limited.

**OPINION**

**LEWIN, J.*—**

I

INTRODUCTION

This is an action by plaintiff and appellant Golden Eagle Refinery Company, Inc. against defendants and respondents, its third party liability insurance carriers.[1] The action is for indemnity for the millions of dollars Golden Eagle spent for the cleanup of environmental contamination at one of its refinery sites, and for the attendant economic losses resulting from its inability to develop or market that property. The trial court granted the insurers' various motions for summary adjudication upon the grounds that Golden Eagle failed to demonstrate a prima facie case for indemnity. The trial court subsequently denied Golden Eagle's timely motion for reconsideration.

The dispositive question of law in this appeal is whether, in an action for *indemnity* under a third party general liability insurance policy, proof of causation and the amount of damages incurred during each policy period are essential elements of the plaintiff's prima facie case. We conclude in the affirmative. Because Golden Eagle failed to present evidence demonstrating an ability to allocate between covered and noncovered acts and among the various different insurers, we affirm.

---

*Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

[1]The respondent insurers include Century Indemnity Company (as successor in interest to CCI Insurance Company, as successor in interest to Insurance Company of North America), Century Indemnity Company (as successor in interest to CIGNA Specialty Insurance Company, formerly known as California Union Insurance Company), Central National Insurance Company of Omaha (with respect to those polices issued by Cravens Dargan Pacific Coast as its managing general agent), Gerling-Konzern General Insurance Company, Pennant Insurance Company, Limited, and The Yasuda Fire and Marine Insurance Company of Europe Limited.

## II

## THE MATERIAL FACTS

The contaminated property which is the subject of this action is a 76-acre tract of land (the Site) located at 21000 South Figueroa Street, Carson, California. The Site was utilized as a crude oil storage tank farm and refinery from at least 1947. Golden Eagle acquired the Site in 1958 and operated the existing oil refinery until 1984. Operation by Golden Eagle and its predecessor Sunset Oil at the Site included the processing and attendant storage of crude oil and crude oil products (petroleum hydrocarbon constituents or PHC) including unfinished naphtha to produce jet fuel, diesel, bunker fuel and kerosene, and in the 1960's leaded gasoline. Refining operations ceased in 1984 and the refinery was dismantled by 1986. Throughout the entire period from 1947 to 1984, the crude oil and crude oil products were routinely and repeatedly discharged and released upon and into the ground. All the events of discharge fell into one of two categories: (1) those that were sudden and accidental; and, (2) those that were not sudden or accidental including some that were intentional.[2] All of the events were either foreseeable or unforeseeable.

Commencing in 1985 the State of California through its various environmental agencies made a series of orders requiring Golden Eagle to investigate, determine, and finally remediate the substantial toxic contamination at the Site. Thereupon Golden Eagle retained a retinue of experts who investigated and evaluated the suspected contamination. In March 1990 Golden Eagle entered into a consent order with the state by which it agreed to remediate the contamination. The removal and treatment of the contaminated soil commenced in March 1991 and continued over the next two years.

Respondent insurers issued third party general liability policies insuring Golden Eagle from 1976 through June 30, 1985. The policies provided limited pollution coverage for claims resulting from sudden and accidental events, and some contained an endorsement entitled "Insurance of Environmental Pollution Risks" (Environmental Impairment Liability, EIL endorsement), extending coverage for pollution risks to damages caused by discharges or releases that were unforeseeable (whether or not sudden and

---

[2]Both sides submitted voluminous evidence of both categories of discharge. Although the separate statements of the opposing parties argued the significance of the others' evidence, they failed to submit competent evidence that events cataloged had not occurred. We need not canvas and analyze all of this evidence because Golden Eagle conceded both types of events occurred. "In short, the evidence before the trial court consisted of both 'sudden and accidental' events *and* non-sudden events."

accidental), and broadened the definition of property damage to include pure financial losses arising from environmental pollution. The EIL policies excluded damage to the insured's own property. Golden Eagle did not notify any of the insurers of the consent order or its remediation expenditures until it filed this action in June 1995, well after it had completed the cleanup. Golden Eagle's claim for its pure financial loss resulting from its inability to market and sell the Site did not emerge until one and one-half years after the filing of this action.

### III

#### THE MOTION FOR SUMMARY ADJUDICATION
#### RE: PURE FINANCIAL LOSSES

The "pure financial losses" claimed by Golden Eagle are losses of approximately $150 million it claimed to have suffered as a result of its inability to market and sell the refinery site. The loss was first raised in the second amended complaint filed December 18, 1996, in which it was alleged that Golden Eagle first suffered the loss "in or around 1986-87." Later, the date reverted to 1984, the year that the last policy was effective.

The pertinent language of the EIL endorsement is as follows:

"1. Notwithstanding anything contained in this Policy to the contrary the cover [*sic*] provided by this Policy is extended to include legal liability for the consequences of a pollution of the environment (earth air water) provided always that this pollution was unforeseeable from the stand-point of the insured or his representatives who are responsible for environmental protection.

"It is understood that pure financial losses arising from an environmental pollution shall be deemed to fall within the property damage definition."

"3. No cover [*sic*] is provided for damage to own property, machinery, etc, arising out of or in connection with Environmental Impairment Liability."

The insurers brought motions for summary adjudication upon the grounds that the policies containing an EIL endorsement clearly excluded coverage for any loss or damage to the insured's own property.

In opposition to the insurers' motion, Golden Eagle asserts the EIL endorsement is ambiguous and must be construed according to its expectations of coverage for this type of loss. In support Golden Eagle relies on the

testimony of Charles Hess, the individual who negotiated the policies in question, and the testimony of two other risk managers employed at the time the policies were purchased. Hess testified that when he negotiated the policies he was directed to obtain "as much *liability* coverage, especially environmental, as possible," (italics added) and that this coverage "was necessary to secure to protect [sic] the corporate assets." He went on to testify that he understood this coverage "was third-party [coverage], but protecting first party exposure." The risk managers merely testified as to their understanding that the "pure financial losses" language in these third party liability policies were somehow first party policies as to pure financial loss. None of these witnesses testified that any of their respective intentions or understandings were ever revealed to any agent or representative of any of the insurers. One of them, Daniel Smith, admitted that this first party coverage would not have been accepted by the carriers, Golden Eagle thereby admitting that it was aware that its unexpressed understanding was contrary to the insurers' understanding and intention.

The motions were brought, heard, and decided several months before the motions regarding the pollution exclusion discussed below. The trial court found that the language of the subject policies excluding coverage for loss or damage to the insured's own property was clear and unambiguous subject to only one reasonable interpretation, that coverage did not exist, and it granted the motions. We agree with the trial court.

Golden Eagle cites *Parsons v. Bristol Development Co.* (1965) 62 Cal.2d 861 [44 Cal.Rptr. 767, 402 P.2d 839], for the proposition that this court is not bound by the trial court's construction of the policies and that undisputed extrinsic evidence is admissible in order to construe a contract.[3] *Parsons* also holds that interpretation and construction of a contract is for the court. "The interpretation of a written instrument, even though it involves what might properly be called a question of fact [citation], is essentially a judicial function to be exercised according to the generally accepted canons of interpretation so that the purposes of the instrument may be given effect." (*Parsons v. Bristol Development Co., supra,* 62 Cal.2d at p. 865.)

In our de novo review (*Krieger v. Nick Alexander Imports, Inc.* (1991) 234 Cal.App.3d 205, 212, fn. 3 [285 Cal.Rptr. 717]), we consider all this

---

[3]Golden Eagle implies the trial court did not consider this undisputed extrinsic evidence. There is nothing in the record to establish whether or not the trial court considered Hess's undisputed testimony. The court did observe that "[i]n situations as here where the contract terms and provisions are clear and explicit, such terms and provisions govern and nothing else *needs* to be considered." (Italics added.) It does not follow, however, that the court did not read and consider Hess's testimony before it concluded that there was but a single reasonable interpretation of the terms of the policies and therefore no ambiguity.

testimony in the context of the language and character of the policies and conclude that the term "pure financial losses" is not excepted from the overriding exclusion of owned property.

The unexpressed understanding or intention of one of the parties to a contract is never sufficient to establish ambiguity. (*City of Mill Valley v. Transamerica Ins. Co.* (1979) 98 Cal.App.3d 595 [159 Cal.Rptr. 635].) Golden Eagle argues that this canon of insurance contract law is limited only to testimony inconsistent with the contract provisions, pointing out that Hess's testimony is consistent with the policy provision. The argument relies on Golden Eagle's own self-serving construction of the policies in order to render Hess's testimony consistent with them. The argument is a paradigm of a "bootstrap" argument.

Hess's entire testimony viewed in the context of his asserted understanding, does not establish any ambiguity or undermine the clear meaning of the terms of the EIL endorsement. Hess testified that he understood he was negotiating third party liability policies, and that he was seeking to protect corporate assets and Golden Eagle's bottom line, all perfectly consistent with such liability policies. Golden Eagle's assets and its bottom line are in fact protected by the policies from judgments obtained by third party plaintiffs.

Finally, we do not agree with Golden Eagle's assertion that "Reading the phrase ['pure financial losses'] to refer *only* to losses incurred by a third party in connection with third party property fails to provide coverage beyond what is already provided in the preceding sentence in the endorsement, etc." and therefore renders the provision "mere surplusage." The preceding sentence of the endorsement provides that "the cover [*sic*] provided by this policy is extended to include *legal liability* for the consequences of pollution of the environment, etc." (Italics added.) The "cover [*sic*] provided by this policy" refers to third party liability coverage; the phrase survives the period at the end of the sentence. Furthermore the insurers correctly point out that there exist claims which might arguably be excluded from the definition of "property damage" such as loss of good will, diminution of sale value, etc., suffered by a third party. Even if there were some arguable confusion in the first section of the EIL endorsement providing pollution coverage and the inclusion of "pure financial losses" in the definition of "property damage," it is swept up and eliminated in section 3 by a crystal- clear, unequivocal exclusion which states in no uncertain terms that "No cover [*sic*] is provided for damage to own property, machinery, etc., arising out of or in connection with Environmental Impairment Liability."

This exclusion clearly applies to each and every provision in the entire EIL endorsement, as counsel for Golden Eagle so aptly put it, "Period."

We find that the "clear and explicit" meaning of the terms of the policies, as used in their "ordinary and popular sense" by a layperson excludes coverage of damage to Golden Eagle's own property. (*AIU Insurance Co. v. Superior Court* (1990) 51 Cal.3d 807, 822 [274 Cal.Rptr. 820, 799 P.2d 1253]; *Bank of the West v. Superior Court* (1992) 2 Cal.4th 1254 [10 Cal.Rptr.2d 538, 833 P.2d 545].)

Although we affirm the trial court's order granting the insurers' motion on the above grounds, it is worthy of note that Golden Eagle's claim for damages for pure financial loss also runs afoul of its inability to differentiate, quantify and allocate these damages as explained below.

IV

THE MOTIONS FOR SUMMARY ADJUDICATION
RE: POLLUTION EXCLUSION

A. *Grounds for the Motions*

The insurers brought these motions for summary adjudication upon the ground that Golden Eagle's claims for indemnity arose from pollution and were therefore excluded under their policies' "qualified" pollution exclusions. The qualified pollution exclusions, in effect, limit any pollution coverage afforded by the policies to damages caused by "sudden and accidental" or "sudden, unintended and unexpected" events.

The insurers presented evidence of 40 years of routine, repeated and intentional release of crude oil and crude oil products onto and into the ground which, at least in substantial part, contributed to the contamination.

The insurers reasoned that if all of the contamination at the Site was caused by the release of petroleum hydrocarbon constituents, some covered and some not, that Golden Eagle having admitted in its answers to interrogatories that it could not differentiate between the damages caused by either, Golden Eagle would be unable to prove a prima facie case *for indemnity*. This, they argue, because a claim under a policy of insurance for indemnity only, is a contract claim and the proximate cause and amount of damages are essential elements of a cause of action for breach of contract which must be proven as part of a prima facie case. The essential elements include proof of

the contract (which policy), breach, and, the precise amount of damage caused by that breach. Golden Eagle's failure to prove any one as part of its prima facie case would result in a judgment for the insurers at trial.

B. *Opposition to the Motions*

Golden Eagle opposed the insurers' motions on the grounds that the insurers had failed to carry their initial burden of proof because they failed to present any evidence establishing what caused the contamination (in contradistinction to evidence of the release of petroleum hydrocarbon constituents into the ground), and that in order to demonstrate that Golden Eagle would be unable to prove a prima facie case, the insurers were required to negate each and every sudden and accidental event of discharge on the Site, and they had failed to do so.

C. *Analysis*

1. *The insurers carried their initial burden establishing the applicability of the pollution exclusions.*

■ The insurers presented voluminous and largely undisputed evidence of the release of PHC into the ground at the Site. Neither side has ever suggested that the pollution at the Site was caused by the release of any other substance. In this day and age, this evidence alone is sufficient to establish that the pollution was *caused* by the release of the PHC. Golden Eagle asserts this is an assumption and constitutes an inference in favor of the insurers inappropriately drawn from competing inferences by the trial court.

We find no competing inferences, but, rather, a simple syllogism. Golden Eagle concedes that irrespective of the character of the release, PHC were the only substances released into the ground, and that PHC and no other substances comprised the contamination. It follows that any release, minute or gross, caused some part of the contamination. Golden Eagle's argument to the contrary implies that upon evidence of the occurrence of two events releasing the same substance, it would be reasonable for the court, without more, to infer that one as opposed to the other caused 100 percent or any other proportion of the contamination. In any event, there is no dispute whatsoever that all of Golden Eagle's claimed damages result from pollution. The establishment of this fact by uncontroverted evidence is sufficient to invoke the pollution exclusions of the policies without regard to whether or not a covered event caused all or part of the damages. In doing so the insurers have carried their initial burden of proof. It would be the insured's burden at trial to prove that all of the damages it seeks to recover were

caused by a covered event of discharge, failing which, Golden Eagle will recover nothing.

2. *The insurers carried their burden pursuant to Code of Civil Procedure section 437c, subdivision (o)(2).*

 Golden Eagle's claim is a claim for indemnity. It is essentially a contract claim. "While insurance contracts have special features, they are still contracts to which the ordinary rules of contractual interpretation apply." (*Bank of the West v. Superior Court, supra,* 2 Cal.4th at p. 1264; *Bluehawk v. Continental Ins. Co.* (1996) 50 Cal.App.4th 1126 [58 Cal.Rptr.2d 147].) By presenting uncontradicted evidence that Golden Eagle could not prove what part of its damages were under the coverage and what part were not, nor which policy applied, the insurers made a sufficient showing shifting the burden to Golden Eagle as contemplated by Code of Civil Procedure section 437c, subdivision (o)(2).

The insurers relied on Golden Eagle's repeated answers to defendant's interrogatories to the effect that: "Golden Eagle is unable to assign or attribute any particular portion or item of this property damage to any particular single event. Put another way, this damage to the groundwater and soils at the site is indivisible as to any particular causal event. . . ." These responses constitute an admission that Golden Eagle would not be able to establish breach of any of its particular policies (contracts to indemnify), or the amount of damages caused by a particular asserted breach by any of the insurers, and are sufficient to support the insurers' motions. (*Union Bank v. Superior Court* (1995) 31 Cal.App.4th 573 [37 Cal.Rptr.2d 653].) Nor does its convenient qualification that its "discovery is continuing, and Golden Eagle reserves its right to add or amend information according to the results of this continuing investigation and discovery, or as Golden Eagle's understanding of the significance of previously discovered or obtained information changes" insulate Golden Eagle from that admission.

The effect of this saving qualification of Golden Eagle's interrogatory answers was to allow it to do whatever was necessary to avoid the otherwise fatal effect of its admission that its damages were "indivisible." Golden Eagle failed to avail itself of the opportunity it created. To this day Golden Eagle has not produced evidence sufficient to overcome its admission,[4] in spite of the fact that it has had over a decade of investigation and remediation by a phalanx of experts, and over four years of litigation and attendant

---

[4]Golden Eagle presented the declaration of William Stone wherein he proffers the self-serving unsupported conclusion that the not covered events were "not a significant cause of the environmental conditions at the Site . . . ." Stone's second declaration in support of

discovery to develop that evidence.[5] Nor did Golden Eagle make any effort whatsoever to avail itself of the provisions of Code of Civil Procedure section 437c, subdivision (h) enacted precisely for such eventuality. It would appear that just as Golden Eagle admitted, the damages caused by the full spectrum of events of discharge truly *are* "indivisible."[6] Properly relying on Golden Eagle's admission, the insurers demonstrated that Golden Eagle could not reasonably be expected to prove what proportion, if any, of the millions of dollars of alleged damages were under the coverage of which of the various policies issued by respondents, failing which, Golden Eagle could not recover anything.

"A site might (for example) have had two sources of pollutants, each of which had contributed to the groundwater contamination, and while FMC could hope to prove that it had not expected *one* of the sources [covered event] to cause the damage it could not reasonably expect to prove that the damage caused by the *other* source was unexpected [not a covered event]. If the totality of damage is attributable to the two sources were considered a single occurrence, then FMC's inability to establish the 'unexpectedly' element as to one of the sources would jeopardize its prospects for coverage as to either source." (*FMC Corp. v. Plaisted & Companies* (1998) 61 Cal.App.4th 1132, 1161 [72 Cal.Rptr.2d 467], italics in original.) The *FMC* court's ruling constitutes an implicit recognition of what is required to prove contract claim for damages.

Golden Eagle did not dispute, and in fact admitted the occurrence of a number of not sudden or not accidental events of discharge over the relevant time period. The parties only disagreed as to the number of events of both types and how such events were properly characterized. Having presented uncontroverted and undisputed evidence establishing events of the release of crude oil and crude oil products onto the ground which were not sudden or accidental, the insurers demonstrated that, at best, they might be contractually bound to indemnify Golden Eagle, if at all, only for some part of its claimed damages, and a failure to indemnify Golden Eagle for 100 percent of its claimed damages would not constitute a breach of their insurance contracts.

---

Golden Eagle's motion for reconsideration was no better. It will be addressed in the part dealing with that motion.

[5]Golden Eagle would have to have presented details of the claimed loss and its causes to have any hope that any of its insurers would adjust and pay the claim.

[6]This is not to say that under the circumstances an equitable apportionment might not have been achieved by indirect circumstantial evidence, but the record does not reveal any evidence or argument to that effect by Golden Eagle.

### 3. *Golden Eagle failed to carry its burden pursuant to Code of Civil Procedure section 437c, subdivision (o)(2).*

Golden Eagle argues that in order to shift the burden of proof pursuant to Code of Civil Procedure section 437c, subdivision (o)(2), respondents were required to produce undisputed evidence that not a single sudden and accidental event of discharge occurred. "In order to shift the summary adjudication burden to Golden Eagle, the Insurers had to establish that Golden Eagle could not reasonably be expected to make a *prima facie* showing that sudden and accidental events happened at the Golden Eagle refinery." And further "[e]ven if the Insurers had shown that non-sudden events caused property damage and that such damage was indivisible from damage caused by sudden and accidental events [which the insurers did show], such a showing would be insufficient to demonstrate that Golden Eagle could not make a *prima facie* showing that *an appreciable amount* of damage was caused by sudden and accidental events." This argument suggests that if Golden Eagle proved at trial that a sudden and accidental event of discharge occurred and caused an "appreciable amount of damage," i.e. some amount between $1 and $100 million, it would have proved a prima facie case, and could have rested and required the insurers to prove the actual amount of damages under the coverage in defense, failing which the jury could award any amount up to the $100 million. There is no authority for this nuance in the burden and order of proof in a contract action for indemnity. Golden Eagle misperceives the focus of the insurers' motions. Its assertions are completely beside the point.

For this proposition, Golden Eagle relies on *Travelers Casualty & Surety Co. v. Superior Court* (1998) 63 Cal.App.4th 1440 [75 Cal.Rptr.2d 54], and *Montrose Chemical Corp. v. Superior Court* (1993) 6 Cal.4th 287 [24 Cal.Rptr.2d 467, 861 P.2d 1153]. Neither case is apposite on the point. In *Travelers* the insurers brought motions for summary adjudication invoking pollution exclusions against their insured, Lockheed, similar to the motions here. In order to shift the burden of proof to Lockheed the insurers pointed to Lockheed's answers to interrogatories. When asked to "identify any releases and discharges at OII that were not gradual and continuous" (thereby covered), Lockheed's responses cataloged only sudden events which *could* or *might* have contributed to the contamination. (*Travelers, supra,* 63 Cal.App.4th at p. 1461.) Lockheed thereby admitted that it could not affirmatively that prove *any* sudden and accidental (covered) event caused any part of the contamination, and thereby admitted it could not make a prima facie case. The court held this to be a sufficient showing to shift the burden to Lockheed. Here Golden Eagle's admission was not that it could

not prove *any* sudden and accidental (covered) event, but rather that Golden Eagle could not prove what proportionate amount of its damages were caused by a covered event, to the exclusion of any amount caused by any not covered event.

The *Travelers* court went on to observe that the trial court ought not and need not engage in any micro-analysis to determine if some of the pollution may have resulted from a covered event of discharge.

The trial court correctly distinguished *Montrose* on the basis that it involved the duty to defend rather than duty to indemnify. In a duty to defend context it matters not whether the amount of damages claimed is one dollar or a million dollars. The insured need demonstrate only that *some part* of the claim *may* fall under the coverage, but the insurer must demonstrate that under no circumstance can any part of the claim fall under the coverage. (*Montrose Chemical Corp. v. Superior Court, supra,* 6 Cal.4th 287, 300.) When the action subsequently goes to trial, the indemnity claim must be reduced to a judgment, which requires an adjudication of the precise amount of the damages claimed. The cause of the damages must be adjudicated in order to establish whether or not the claim is under the coverage. The burden of proof to support these adjudications is on the plaintiff. "Unlike the obligation to indemnify, which is only determined when the insured's underlying liability is established the duty to defend must be assessed at the very outset of a case. An insurer may have a duty to defend even when it ultimately has no obligation to indemnify, either because no damages are awarded in the underlying action against the insured or because the actual judgment is for damages not covered under the policy." (*Borg v. Transamerica Ins. Co.* (1996) 47 Cal.App.4th 448, 454 [54 Cal.Rptr.2d 811]; *Montrose Chemical Corp. v. Admiral Ins. Co.* (1995) 10 Cal.4th 645, 659, fn. 9 [42 Cal.Rptr.2d 324, 913 P.2d 878].) Here Golden Eagle is effectively in the indemnity phase and would have to prove the amount and cause of its damages in order to obtain a judgment against the insurers.[7]

In *Travelers,* had Lockheed positively identified and proved any sudden and accidental event of discharge had caused an appreciable amount of the contamination, the parties would have found themselves in the same posture

---

[7]In its brief Golden Eagles argues that "[a]s a practical matter, on motions for summary adjudication, the two burdens are the same. Potential coverage is all that is required." Herein lies the fallacy of Golden Eagle's argument. It simply ignores that once the potential for coverage is established, any eventual indemnity will have to await trial of the underlying action wherein the claim must be proved as to cause and amount, failing which, there will be no indemnity and the insured may well be liable to the insurer for the cost of defense if furnished under a reservation of rights.

as the parties here, and squarely within the purview of *FMC*. This case, like *FMC*, is the next logical step following *Travelers,* a step which adds the elements of the cause and amount of damages to Golden Eagle's prima facie case.

The insurers have not negated the occurrence of all sudden and accidental events. In fact they concede that they occurred, and tacitly admit that some portion of the contamination resulted from those events. If we assume arguendo that one-half of the substances in the ground were the result of covered events, and one-half the result of not covered events, in the context of a breach of contract/indemnity claim, the insurers would be required to indemnify no more than the one-half of Golden Eagle's damages caused by the covered events. Furthermore, if the soil was contaminated to a level requiring its removal prior to the inception of the first policy, Golden Eagle would be unable to prove any contract damages resulting from a breach on the part of the insurers. The same reasoning applies to the identification of the policy period in which any covered event occurred. The insurers are not required to indemnify for any damages not caused by a covered event.

It is axiomatic that in order to prove a cause of action for breach of contract the plaintiff must prove a breach by the defendant and the amount of damages *caused* by the breach. (*Reichert v. General Ins. Co.* (1968) 68 Cal.2d 822, 830 [69 Cal.Rptr. 321, 442 P.2d 377]; BAJI No. 10.85.) Relying on Golden Eagle's admission that it could not differentiate any of its damages as to cause and time, the insurers thereby presented undisputed evidence that Golden Eagle would be unable to make a prima facie case for breach of contract.

*FMC Corp. v. Plaisted & Companies, supra,* 61 Cal.App.4th 1132, is squarely on point. Golden Eagle's effort to distinguish and dismiss its significance on the basis that the appeal was from a judgment after trial rather than from a summary judgment, and that the court failed to specifically hold that proof of the contract, breach, causation and damages were part of a prima facie case, amounts to no more than a procedural quibble. Although under its facts the court's holding is arguably dicta, *FMC* stands for the proposition that where both covered and not covered events cause damages a failure to differentiate and allocate is fatal to a claim for indemnity. It makes no difference whether the lack of proof is demonstrated on summary judgment or at trial. The whole point of Code of Civil Procedure section 437c, subdivision (o)(2) is that once the burden of proof has been shifted to plaintiff, he is required to produce the evidence by which he will,

someday, when the time comes, at the time of trial, eventually, be able to make a prima facie case.[8]

Golden Eagle submitted the declaration of its expert, William Stone. Stone opined that petroleum hydrocarbon constituents got to the ground, that they remained there and comprised the contamination the state required Golden Eagle to remove.[9] Stone also testified that "[t]here may have been other events or happenings other than those listed above which resulted in petroleum hydrocarbon constituents getting to the ground at the Site. It is possible that some or all of the crude oil or petroleum hydrocarbon products released in these other events or happenings may have necessitated some of the remedial action Golden Eagle took at the Site. . . . I do not have reliable evidence with which to quantify any damage caused by any such other event or happening." Significantly this testimony is not limited only to sudden and accidental events or happenings, although Stone later concludes, without explanation or revealing his reasons, that the events which were not sudden or accidental but released the same petroleum hydrocarbon constituents somehow did not contribute to, or cause any of the contamination at the Site.[10] Stone's testimony that sudden and accidental events of discharge were the exclusive cause of the contamination amounts to no more than a self-serving conclusions devoid of any basis, explanation, or reasoning. It was properly excluded by the trial court. ■ "[A]n expert opinion is worth no more than the reasons upon which it rests." "[A]n opinion unsupported by reasons or explanations does not establish the absence of a material fact issue for trial, as required for summary judgment." (*Kelley v. Trunk* (1998) 66 Cal.App.4th 519, 524 [78 Cal.Rptr.2d 122].)

Even if Stone's declaration were admitted in evidence and considered, it is not sufficient to overcome the admission of Golden Eagle's answers to interrogatories; if anything, it confirms it. The insurers did not take the position that the sudden and accidental events upon which Stone relied did not occur or that they did not result in the release of some PHC to the ground. They correctly point out that Stone's declaration does not refute Golden Eagle's admission that its damages were "indivisible."

[8]Many practitioners feel that the greatest utility of motions for summary judgment is their proof-producing force to eliminate meritless claims. (*Celotex Corp. v. Catrett* (1986) 477 U.S. 317 [106 S.Ct. 2548, 91 L.Ed.2d 265].)

[9]It is worthy of note that Stone's opinion that all of the pollution was caused by the release of petroleum hydrocarbon constituents supports the insurers' assumption that any release of PHC causes pollution requiring cleanup.

[10]We note that Stone's testimony is consistent with the admission contained in Golden Eagle's interrogatory answers to the effect that it could not differentiate, quantify, or allocate its damages.

Simply put, the establishment that some sudden and accidental events occurred and that they caused an "appreciable amount" of damages does not overcome an admission that those very damages are indivisible from any other damages. (*D'Amico v. Board of Medical Examiners* (1974) 11 Cal.3d 1 [112 Cal.Rptr. 786, 520 P.2d 10]; *Leasman v. Beech Aircraft Corp.* (1975) 48 Cal.App.3d 376 [121 Cal.Rptr. 768].)

Golden Eagle's argument that it need only prove that a sudden and accidental event caused an appreciable amount of the contamination is wrong because it is essentially a tort approach. Golden Eagle's claim is for indemnity and sounds in contract. To prove a claim for breach of contract, more is required than evidence that a covered cause was a "substantial contributing cause" of its damage. "Substantial cause" may be sufficient to make a prima facie case in a tort action in order to support a joint and several judgment, but in the context of a coverage dispute relating only to the duty to indemnify, the tort threshold is not sufficient.

A claim for indemnity is a contract claim and causation and the amount of damages are essential elements of a prima facie case. "It is essential to establish a *causal connection* between the breach and the damages sought. [Citations.]" (1 Witkin, Summary of Cal. Law (9th ed. 1987) Contracts, § 814, p. 733, italics added.) This rule has been codified in Civil Code section 3300, which reads in pertinent part: "For the breach of an obligation arising from contract, the measure of damages, . . . is the amount which will compensate the party aggrieved for all the detriment *proximately caused thereby* . . . ." (Italics added.) Here, there was uncontroverted evidence of years of routine, repeated, foreseeable, sometimes intentional, not sudden events of dumping, leaks, spills, etc. of the same crude oil and crude oil products. Irrespective of the nature of the event of discharge, neither Golden Eagle nor the insurers ever suggested that any substance other than petroleum hydrocarbon constituents "got to the ground," or caused the contamination. Golden Eagle's expert testified these were the substances that caused the contamination at the Site. This presents the substantial possibility that all of the soil that Golden Eagle was required to remove was contaminated to a threshold level requiring its removal long before any of the policies issued to Golden Eagle incepted. Once the contamination reaches a level requiring remediation, it does not matter what amount of additional toxic substances reach the ground, unless, of course, increased migration or penetration of toxic substances could be demonstrated. Such demonstration requires the identification, allocation, and quantification of the contamination in relation to its source. It follows that Golden Eagle's admitted inability to present evidence differentiating, quantifying, and allocating the contamination from

each of the sources would be absolutely fatal to all of its claims for indemnity.

Golden Eagle, pursuant to its misinterpretation of the insurers' motions and its erroneous reading of *Travelers,* elected to limit its opposition to the insurer's motions to one disputing whether or not the insurers had carried their initial burden and made sufficient showing shifting the burden of proof regarding the exceptions to the pollution exclusions.[11]

The trial court, however, determined that the insurers had made a sufficient showing shifting the burden of proof, and, finding no competent evidence demonstrating Golden Eagle could make a prima facie case without allocating the cause and amount of its claimed damages as to any one of its insurance policies, properly granted the insurers' motions.

V

### THE MOTIONS FOR SUMMARY ADJUDICATION
### RE: THE ENVIRONMENTAL POLLUTION RISKS ENDORSEMENT

Some of the policies issued by the insurers contained an "Insurance of Environmental Pollution Risks" (EIL) endorsement, which read: "Notwithstanding anything contained in this Policy to the contrary the cover provided by this Policy is extended to include legal liability for the consequences of a pollution of the environment (earth air water) provided always that this pollution was unforeseeable from the stand-point of the insured or his representatives who are responsible for environmental protection." The trial court granted the insurer's motions as to these policies finding that all the pollution at the Site was foreseeable from the standpoint of the insured. In the abstract what is and what is not foreseeable usually presents a disputed question of fact preventing summary judgment. But here, even though there is arguably conflicting evidence as to some of the events of discharge, there remained a substantial number events of discharge as to which the evidence is not controverted. Golden Eagle is correct when it observes that pollution coverage under the policies containing an EIL endorsement is broader than the policies which have only a sudden and accidental exception to the pollution exclusion. The difficulty with this observation is that it does not aid Golden Eagle's position. In supplanting the sudden and accidental

---

[11]Golden Eagle would later argue on its motion for reconsideration its counsel could not possibly conceive that any court could conclude that the insurers had carried their burden, and therefore Golden Eagle's admission regarding its damages required no response. The trial court disagreed, and so do we.

exception with the foreseeability criterion, many of the events that Golden Eagle vigorously asserted as sudden and accidental and causing substantial contamination would not be under the coverage because they were clearly foreseeable. This results in a substantial increase of the proportion of the damages that do not fall under the coverage, were the ultimate proportion susceptible of proof. In the context of Golden Eagle's admission regarding the indivisibility of its damages, the trial court was correct when it observed that those policies present an a fortiori application of Golden Eagle's admission that its damages were indivisible. The trial court's observation that all of Golden Eagle's damages resulted from events that were foreseeable is gratuitous whether or not it constitutes a finding of fact from conflicting evidence, because the result it reached was correct.

## VI

### PLAINTIFF'S MOTION FOR RECONSIDERATION

Upon the granting of the insurers' motions for summary adjudication Golden Eagle brought its motion for reconsideration. The court denied the motion finding that Golden Eagle had not submitted anything new or different, and, in any event, had not made a sufficient showing excusing its failure to present what it did present in support of its motion for reconsideration, in the original motion. We review the court's denial to determine if the trial court abused its discretion. ■ "It is fairly deducible from the cases that one of the essential attributes of the abuse of discretion is that it must clearly appear to effect injustice. [Citations.] Discretion is abused whenever, in its exercise, the court exceeds the bounds of reason, all of the circumstances before it being considered. The burden is on the party complaining to establish an abuse of discretion, and unless a clear case of abuse is shown and unless there has been a miscarriage of justice a reviewing court will not substitute its opinion and thereby divest the trial court of its discretionary power. [Citation.]" (*Loomis v. Loomis* (1960) 181 Cal.App.2d 345, 348-349 [5 Cal.Rptr. 550], cited with approval in *Denham v. Superior Court* (1970) 2 Cal.3d 557, 566 [86 Cal.Rptr. 65, 468 P.2d 193].) We find no abuse of discretion by the trial court.

Golden Eagle's argument that the trial court erroneously concluded that it did not have jurisdiction to grant reconsideration, implies that the court felt its hands were tied, and, but for its lack of jurisdiction, was inclined to grant the motion. The transcript of the hearings on the original motions and the motion for reconsideration demonstrates quite the contrary.

As to the reconsideration of the motions regarding the pollution exclusions Golden Eagle submitted the second Stone declaration seeking to cure

the deficiencies of his earlier declaration in opposition to the summary adjudication. The trial court left little doubt as to the basis for its exclusion of the first Stone declaration: "I sure hope the evidence [submitted with the motion for reconsideration] is different than that one declaration that was submitted. I think it was by somebody named Stone. If there was ever a more conclusory declaration submitted in connection with the motion that I have had in the twelve or eleven years that I've been doing this, that was it."

The second Stone declaration submitted with appellant's motion for reconsideration was no better, and the trial court was correct when it concluded there was nothing new. In it, Stone simply cataloged all the material he had reviewed and once again proffered nothing but unsupported conclusions. He testified that he had created a computer model of some sort by which he was able to determine that virtually all of the contamination at the Site was exclusively the result of what *he* had determined were sudden and accidental events of discharge. All of the substances released onto the ground over 40 years were the same crude oil and crude oil products. Stone would have the court believe that he could accurately differentiate between all of the sudden and accidental events, and the not sudden and accidental events and allocate specific cubic yards of soil removed as result of each category, even though he repeatedly testified that as to the sudden and accidental events "it is difficult if not impossible to separate the damage caused by one accident from the damage caused by the other accidents." By way of example, Stone admits that if two refinery employees each accidentally kicked over a bucket of kerosene on separate occasions he would be unable to differentiate the contamination, but if a month or more later another employee intentionally poured a bucket of kerosene on the ground that his program enabled him to quantify and allocate the resulting contamination between the accidental and intentional events. As preposterous as that may appear, we will allow that such science may be available. But Stone's second declaration, just as his first, does not contain any reasoning or explanation, or even identify the remarkable program capable of this astonishing feat. The inescapable implication of the trial court's finding that Golden Eagle had presented nothing new, is that it reviewed the substance of Stone's second declaration, and even had it granted reconsideration, it would, a fortiori, have excluded the second Stone declaration.

At the beginning of the hearing the court did state: "[Code of Civil Procedure section] 1008 is jurisdictional. . . . Either the requirements of 1008 have been satisfied or they're not. If they're not, then I have no alternative to deny a motion for reconsideration no matter how meritorious your claim. I don't suggest that it is or isn't at this time." The court's observation may be academic, but until section 1008 is held to be an

unconstitutional restriction of a court's inherent power to correct its own errors, it was correct.

The trial court went on to explain: "plaintiffs have failed to present any new or different facts, circumstances or law as required by [Code of Civil Procedure] section 1008. Even if the plaintiffs had presented new or different facts, circumstances or law, they provided no satisfactory explanation as to why they failed to produce these at the original hearing. And the motion is denied." This demonstrates that it considered the substance of the second Stone declaration finding nothing new. Having found the first Stone declaration incompetent it follows that Golden Eagle's showing supporting its motion for reconsideration remained insufficient to overcome the insurers' motions for summary adjudication.

Clearly, having found that Golden Eagle had presented nothing new or different and had failed to present sufficient reason for its failure to present the material asserted to be new and different at the original motion, the so called *Mink* Factors (*Mink v. Superior Court* (1992) 2 Cal.App.4th 1338 [4 Cal.Rptr.2d 195]), whether or not the trial court believed that they were jurisdictional became academic and moot. The logic is this: Stone's first declaration was not sufficient to overcome the insurers' motions; his second declaration added nothing new; ergo, together they were not sufficient to overcome the motions. It follows that Golden Eagle has not demonstrated a meritorious claim and therefore the denial of its motion for reconsideration cannot constitute an injustice, hence there is no abuse of discretion.

## VII

### ALTERNATIVE GROUNDS AND DISPOSITION

As we have found the motions for summary adjudication were properly granted, we do not address the alternative grounds advanced by the insurers in support of their motions.

The judgment is affirmed.

Vogel (C. S.), P. J., and Hastings, J., concurred.

A petition for a rehearing was denied February 2, 2001, and appellants' petition for review by the Supreme Court was denied April 11, 2001.