[No. B113652. Second Dist., Div. Five. Mar. 30, 1998.]

STANDUN, INC., Plaintiff and Appellant, v.
FIREMAN'S FUND INSURANCE COMPANY et al., Defendants and
Respondents.

884

**COUNSEL**

Daniel L. Germain for Plaintiff and Appellant.

Caron, McCormick, Constants & Goldberg, Donald W. McCormick, Paul A. Tenner, Kern & Wooley, Ronald J. Skocypec and Lisa M. Kralik for Defendants and Respondents.

**OPINION**

**GRIGNON, J.**—In this case, we are concerned with comprehensive general liability insurance policies containing standard "sudden and accidental"

pollution exclusions. For the policy years in question, the insured operated a machine shop and contracted for the regular off-site disposal of its liquid wastes at a municipal landfill. Subsequently, the insured was sued to contribute to the costs of the environmental cleanup of the landfill. The insured sought a defense from its insurers, which they declined to provide. The insured brought this action for declaratory relief, and the trial court entered summary judgment in favor of the insurers. We conclude coverage was barred by the pollution exclusion, because the property damage arose out of the purposeful, long-term, and regular discharge of waste materials into or upon the land by the insured or its agent. We affirm.

## FACTS[1] AND PROCEDURAL BACKGROUND

*The Landfill*

Operating Industries, Inc. (OII) operated a 190-acre municipal landfill in Monterey Park. The landfill was in operation between 1948 and 1984, and was used for the disposal of industrial, commercial, and residential wastes. The disposal of liquid industrial wastes commenced in 1954. Initially, liquid wastes were to be deposited in virgin soil and not to be distributed over refuse. In 1956, liquid wastes were permitted to be mixed at the working face of the landfill, provided no ponding occurred. In 1959, certain semiliquid wastes were permitted to be immediately mixed with refuse in a manner to prevent runoff. In 1976, the disposal of liquid wastes was limited to certain areas of the landfill. Liquid wastes continued to be mixed with solid refuse at prescribed ratios. OII ceased accepting liquid wastes in 1983.

Operations at the landfill polluted the environment. The land at the landfill and the groundwater became contaminated. Toxic gases were released into the air. Toxic substances migrated from the landfill to adjoining properties. OII engaged in poor waste management practices, which contributed to the pollution at the landfill. In February and March 1975, semiliquid wastes were sometimes stored overnight in sumps, instead of being mixed immediately with refuse or dirt. In February and March 1975, vacuum trucks delivering waste materials to the landfill were washed out at the site and the wash water was allowed to flow to an open sump, permitting the ponding of liquid wastes. In August 1983, a leachate[2] spill occurred and wastewater was discharged into the storm drainage system. In 1983, leachate migrated off site with storm runoff. Other incidents in 1983 included slope failures

---

[1]The material facts are not in dispute.

[2]"Leachate consists of liquid byproducts of the natural decomposition process of trash in a landfill environment." (*Millipore Corp.* v. *Travelers Indem. Co.* (1st Cir. 1997) 115 F.3d 21, 26, fn. 5.)

and problems with the structural integrity and capacity of underground leachate storage tanks. Problems might also have been caused by seismic activity, earth movement, and precipitation.

## The Insured's Waste Disposal

Plaintiff and appellant Standun, Inc.[3] operated a manufacturing facility in Compton. The principal operations at the facility included the machining and grinding of parts for can-making machines, steam cleaning parts in preparation for use, the assembly of can-making machines, and the manufacture of dies. Standun's manufacturing operations generated waste materials. Approximately 125,000 gallons of waste were sent by Standun to the OII landfill between February 1975 and November 1982. The liquid waste consisted of mixtures of water, oil, mud, and other materials and was transported on a regular basis to the OII landfill in vacuum trucks operated by various liquid waste haulers.

## Environmental Protection Agency Claim

In 1986, the United States Environmental Protection Agency (EPA) placed the OII landfill on the National Priorities Superfund List. In 1989, Standun was notified by the EPA that it was a potentially responsible party with respect to the OII landfill, based on the documented volume of hazardous waste shipped from Standun's Compton manufacturing facility to the OII landfill in Monterey Park. A responsible party is obligated to finance or undertake actions necessary to clean up the polluted site. "Responsible parties are liable for the costs incurred by the government in responding to any release or threatened release at the site. Such costs can include expenditures for investigation, planning, cleanup of the site, and enforcement." The EPA offered Standun the opportunity to participate in a partial settlement of the claims related to the OII landfill. In 1995, the EPA advised Standun that its share of the costs to that date was approximately $350,000. Standun declined to settle.

## Action for Contribution

In 1992, Standun was sued for contribution by businesses which had participated in the partial settlement of the EPA claims. The plaintiffs in this action alleged that Standun had deposited hazardous substances at the OII landfill and was liable for its proportionate share of the EPA-imposed cleanup costs. Standun settled this action for $45,000.

---

[3]The current Standun entity is not the same Standun entity which is the named insured under the relevant policies. In the interest of clarity, we refer to all Standun entities as "Standun."

*The Policies*

From July 1974 to August 1979, Standun obtained comprehensive general liability insurance from Fireman's Fund. From 1980 to 1987, Standun was insured by Liberty Mutual.[4] The policies contained virtually identical language. With respect to coverage, the policies provided: "The company will pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of Coverage A. bodily injury or Coverage B. property damage to which this insurance applies, caused by an occurrence." "Occurrence" was defined as "an accident, including continuous or repeated exposure to conditions, which results in bodily injury or property damage neither expected nor intended from the standpoint of the insured."

Each policy also contained a pollution exclusion, providing that the insurance did not apply to "property damage arising out of the discharge, dispersal, release or escape of smoke, vapors, soot, fumes, acids, alkalis, toxic chemicals, liquids or gases, waste materials or other irritants, contaminants or pollutants into or upon land, the atmosphere or any water course or body of water; but this exclusion does not apply if such discharge, dispersal, release or escape is sudden and accidental." Each policy also imposed upon the insurer a duty to defend any suit against the insured seeking covered damages.

*The Instant Action*

Standun demanded a defense and indemnity of the EPA claim and the related contribution action from Fireman's Fund and Liberty Mutual. Both insurers denied coverage and defense obligations.

On June 6, 1996, Standun filed its complaint against Fireman's Fund and Liberty Mutual for breach of contract and seeking declaratory relief regarding the insurers' duty to defend the underlying EPA claim and related litigation. Standun alleged the EPA claim was based on allegations that Standun released certain substances at the OII landfill causing property damage.

Cross-motions for summary judgment were filed. Standun argued that since it had raised a potential for coverage, the insurers were obligated to provide a defense to the underlying claims. The insurers contended that the underlying claims were not covered because they were based on Standun's

---

[4]Standun seeks no coverage from the insurer which provided it with insurance in the period between Fireman's Fund's policy and Liberty Mutual's policy.

intentional release of hazardous substances into the environment at the OII landfill, and therefore could not be covered "occurrences." The insurers further contended any potential claims were excluded from coverage by the pollution exclusion, in that Standun could not establish that any covered release was sudden and accidental. The insurers also contended Standun was not an insured under the policies and the EPA claim was not a "suit" giving rise to a duty to defend. Standun replied that, although its release of waste into the landfill was intentional, there may have been subsequent sudden and accidental discharges of the pollutants from the landfill into the environment.

The trial court concluded the relevant polluting event was Standun's discharges of waste at the OII landfill. As such discharges were intentional, there was no coverage. Subsequent events, even if sudden and accidental, were not the basis of the underlying claims against Standun, and were therefore irrelevant. Judgment was entered in favor of the insurers. Standun filed a timely notice of appeal.

DISCUSSION

*Standard of Review*

■ We review orders granting or denying a summary judgment motion de novo. (*FSR Brokerage, Inc.* v. *Superior Court* (1995) 35 Cal.App.4th 69, 72 [41 Cal.Rptr.2d 404]; *Union Bank* v. *Superior Court* (1995) 31 Cal.App.4th 573, 580-581 [37 Cal.Rptr.2d 653].) We exercise "an independent assessment of the correctness of the trial court's ruling, applying the same legal standard as the trial court . . . ." (*Iverson* v. *Muroc Unified School Dist.* (1995) 32 Cal.App.4th 218, 222 [38 Cal.Rptr.2d 35]; *Union Bank* v. *Superior Court, supra,* 31 Cal.App.4th at p. 579.)

*Duty to Defend*

■ " '[A] liability insurer owes a broad duty to defend its insured against claims that create a potential for indemnity. [Citation.] . . . "[T]he carrier must defend a suit which *potentially* seeks damages within the coverage of the policy." [Citation.] Implicit in this rule is the principle that the duty to defend is broader than the duty to indemnify; an insurer may owe a duty to defend its insured in an action in which no damages ultimately are awarded. [Citations.]' [Citation.]" (*Montrose Chemical Corp.* v. *Superior Court* (1993) 6 Cal.4th 287, 295 [24 Cal.Rptr.2d 467, 861 P.2d 1153], italics in original.)

To prevail in an action seeking declaratory relief on the issue of duty to defend, the insured must prove the existence of a potential for coverage,

while the insurer must establish the absence of any such potential. "In other words, the insured need only show that the underlying claim *may* fall within policy coverage; the insurer must prove it *cannot*." (*Montrose Chemical Corp.* v. *Superior Court, supra,* 6 Cal.4th at p. 300, italics in original.) The inquiry should first focus on the allegations of the complaint, but the insured may rely on extrinsic evidence to give rise to a duty to defend. (*Id.* at p. 295.) Likewise, an insurer can rely on extrinsic facts to defeat a duty of defense, if such facts conclusively eliminate the potential for coverage. (*Id.* at pp. 298-299.)

*Pollution Exclusion*

 Standun contends summary judgment should be reversed because triable issues of fact exist concerning the existence of an "occurrence," the applicability of the pollution exclusion, the nature of the EPA claim as a "suit," and Standun's standing to assert the rights of its predecessor under the policies. Because we conclude the sudden and accidental pollution exclusion bars coverage, we do not reach the other issues.

 The pollution exclusion applies to the discharge of pollutants into or upon the land, air or water. The sudden and accidental exception to the pollution exclusion refers to the discharge of pollutants. "Sudden" has a temporal element and does not mean a gradual or continuous discharge. (*ACL Technologies, Inc.* v. *Northbrook Property & Casualty Ins. Co.* (1993) 17 Cal.App.4th 1773, 1788 [22 Cal.Rptr.2d 206]; *Shell Oil Co.* v. *Winterthur Swiss Ins. Co.* (1993) 12 Cal.App.4th 715, 752-754 [15 Cal.Rptr.2d 815].) "Accidental" means an unexpected or unintended *discharge*, not unexpected or unintended *damage*. (*Shell Oil Co.* v. *Winterthur Swiss Ins. Co., supra,* 12 Cal.App.4th at pp. 755-783.) The pollution exclusion is "not contingent on whether the insured expected or intended any property damage. Instead, the exclusion[] depend[s] on the nature of the polluting event and the insured's knowledge or belief that a pollutant would escape." (*Id.* at p. 783.) "It is well established that whether the damages were intended or expected is irrelevant; the pollution exclusion plainly refers to the discharge and not to the environmental damages themselves." (*St. Paul Fire and Marine Ins.* v. *Warwick Dyeing* (1st Cir. 1994) 26 F.3d 1195, 1203, italics omitted.)

 Thus, the pertinent inquiry becomes, what is the relevant discharge of pollutants for purposes of the pollution exclusion. The insurers contend the relevant discharge of pollutants is the disposal of waste at the landfill. Standun contends the relevant discharge of pollutants is the subsequent escape of pollutants from the landfill into the surrounding environment. No

California authority has decided this issue and other jurisdictions have reached differing conclusions.[5] For the reasons set forth below, we are persuaded that, in this case, the relevant discharge is the initial disposal of wastes into the landfill.

We look first to the underlying claims to determine the polluting event. Both the EPA claim and the third party action for contribution seek damages from Standun arising out of Standun's disposal of hazardous wastes at the OII landfill. The EPA is pursuing Standun under the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA), "a strict liability statute that serves essentially remedial goals, irrespective of fault." (*AIU Ins. Co.* v. *Superior Court* (1990) 51 Cal.3d 807, 836 [274 Cal.Rptr. 820, 799 P.2d 1253].) The third party action is seeking contribution from Standun under the same federal act. Both "suits" are concerned with the release of waste by Standun at the OII landfill; neither is concerned with whether any such release was accidental or intentional. However, the evidence is undisputed that Standun purposefully gave its liquid industrial waste to transporters, that, as expected, brought it to the OII landfill, where it was released directly into the land. Standun's liability under CERCLA is based on this discharge and the amount of its liability is calculated on the basis of the ratio of its documented waste disposal to the total waste disposal at the landfill.

The pollution exclusion focuses on the discharge of pollutants into or upon the land, air or water and not on the environmental damage caused by the discharge. (*St. Paul Fire and Marine Ins.* v. *Warwick Dyeing, supra,* 26

---

[5]*Kerr-McGee Corp.* v. *Admiral Ins. Co.* (Okla. 1995) 905 P.2d 760 (pollution exclusion bars coverage for long-term disposal of hazardous wastes at licensed hazardous waste disposal site); *Transamerica Ins. Co.* v. *Duro Bag Mfg. Co.* (6th Cir. 1995) 50 F.3d 370, 373 (applying Kentucky law; pollution exclusion bars coverage for disposal of industrial wastes at landfill); *EAD Metallurgical, Inc.* v. *Aetna Cas. & Sur. Co.* (2d Cir. 1990) 905 F.2d 8 (applying New York law; pollution exclusion bars coverage for discharge of pollutants into sewer, sewage treatment facility, and landfill); *County of Fulton* v. *U.S. Fidelity and Guaranty Co.* (1993) 195 A.D.2d 864 [600 N.Y.S.2d 972] (pollution exclusion bars coverage for long-term deposit of solid wastes at landfill); *St. Paul Fire and Marine Ins.* v. *Warwick Dyeing* (1st Cir. 1994) 26 F.3d 1195, 1204-1205 (applying Rhode Island law; pollution exclusion bars coverage for deposit of wastes into landfill); *Broderick Inv. Co.* v. *Hartford Acc. & Indem. Co.* (10th Cir. 1992) 954 F.2d 601, 607-608 (applying Colorado law; pollution exclusion bars coverage for discharge of wastes into unlined holding ponds); compare with *Key Tronic* v. *Aetna (Cigna) Fire Ins. Co.* (1994) 124 Wn.2d 618 [881 P.2d 201, 206] (escape of polluting materials from landfill is relevant polluting event); *Union Pac. Resources* v. *Aetna Cas. & Sur.* (Tex.Ct.App. 1994) 894 S.W.2d 401, 404 (deposit of pollutants into landfill is not triggering event); and see *Auto Owners Ins. Co.* v. *City of Clare* (1994) 446 Mich. 1 [521 N.W.2d 480, 486] (no coverage because insured on notice landfill was inadequate to protect environment); *Millipore Corp.* v. *Travelers Indem. Co.* (1st Cir. 1997) 115 F.3d 21, 33-34 (applying Massachusetts law; coverage for subsequent unexpected and abrupt release of a significant amount of pollutants into environment).

F.3d at p. 1203; *Transamerica Ins. Co.* v. *Duro Bag Mfg. Co.*, *supra*, 50 F.3d 370, 372-373.) Where hazardous waste material is deposited directly into a landfill, the relevant discharge of pollutants for purposes of the pollution exclusion is the initial release of the hazardous waste into the landfill, not the subsequent release of pollutants from the landfill into the water, air and adjoining land. (*St. Paul Fire and Marine Ins.* v. *Warwick Dyeing, supra,* 26 F.3d at p. 1203.) This discharge of pollutants into or upon the land is to be distinguished from the subsequent contamination of the environment and the condition of the landfill, which constitute the damages arising out of the discharge of pollutants onto the land. (*Id.* at p. 1204.)

Such a discharge of hazardous waste directly into a landfill is to be further distinguished from the release of hazardous wastes stored in tanks, drums or other containers. (*St. Paul Fire and Marine Ins.* v. *Warwick Dyeing, supra,* 26 F.3d at pp. 1204-1205.) In the cases of hazardous wastes deposited into storage containers, which wastes are subsequently released into the environment, the relevant discharge is the release from the storage containers, because the original disposal of wastes into the storage container is not a discharge into the land, the air or the water. (*Id.* at p. 1205.) A landfill is not a similar containment vessel, because the landfill vessel is itself land. (*Ibid.*; cf. *Patz* v. *St. Paul Fire and Marine Ins.* (7th Cir. 1994) 15 F.3d 699, 703-705 [clay-lined evaporation pit].)

Where an insured arranges to have its hazardous waste materials collected and removed from its property for proper disposal in a municipal landfill by a third party, the proper disposal of the waste by the third party into the landfill is a discharge of pollutants for purposes of the pollution exclusion. (*St. Paul Fire and Marine Ins.* v. *Warwick Dyeing, supra,* 26 F.3d at pp. 1201-1203.) It is irrelevant for purposes of the pollution exclusion that the insured complied with all applicable regulations and licensing requirements at the time of the disposal of the hazardous waste. (*Ibid.*) It is also irrelevant that the insured did not intend to contaminate the environment. (*Id.* at pp. 1204-1205; *Kerr-McGee Corp.* v. *Admiral Ins. Co.*, *supra*, 905 P.2d 760, 764.) The relevant discharge is the disposal and that discharge is neither sudden nor accidental; it is purposeful and regular.

Here, Standun arranged with waste haulers to transport its liquid industrial waste in vacuum trucks to the OII landfill. The liquid waste was discharged directly into the landfill and mixed with dirt, refuse or a combination of the two. None of the Standun liquid waste was stored in underground tanks, all of it was discharged directly onto the land. Some of it may have been temporarily placed in open sumps and not immediately mixed with dirt or refuse as required by applicable regulations. Some of it may have spilled as

wastewater from the vacuum trucks and may have fallen onto the land at undesirable locations or flowed into the sumps. In all events, the Standun liquid waste was purposefully discharged directly onto the land. Only the timing and the location of the discharges may have varied.

The relevant discharge as to Standun is the discharge of its wastes into the landfill. That discharge was purposeful and regular. Accordingly, the relevant discharge of pollutants was neither sudden nor accidental and coverage under the policy is barred by the pollution exclusion.

Standun relies on two cases which reverse summary judgment in favor of the insurer on the issue of duty to defend, when it was not known how each and every pollutant escaped into the environment, because it was possible that some pollutants were released suddenly and accidentally. (*A-H Plating, Inc.* v. *American National Fire Ins. Co.* (1997) 57 Cal.App.4th 427, 437 [67 Cal.Rptr.2d 113]; *Vann* v. *Travelers Companies* (1995) 39 Cal.App.4th 1610, 1616-1618 [46 Cal.Rptr.2d 617].) *A-H Plating* and *Vann* are distinguishable in that both involved pollution at the insured's place of business arising from the day-to-day operation of the insured's business, rather than the regular transport of waste off site. In such cases, contaminants could have been discharged into the environment accidentally, in addition to the routine discharges occurring in the course of the insured's business. The *Vann* court stated, "The record at this stage of the proceeding provides nothing which conclusively explains the source of the contamination, or whether the release of pollutants came about exclusively as the result of the routine disposal of the hazardous byproducts of [the insured's business] or, in part, by a condition that developed so rapidly it could properly be described as a 'sudden' event." (*Vann* v. *Travelers Companies*, *supra*, 39 Cal.App.4th at pp. 1617-1618.)

Standun also relies on *Montrose Chemical Corp.* v. *Superior Court, supra*, 6 Cal.4th 287. *Montrose* is distinguishable in that it was concerned with whether the environmental damage was an "occurrence," and did not consider the pollution exclusion. (*Id.* at p. 293.) Moreover, *Montrose* also involved pollution at the insured's place of business arising out of the insured's operation of its own business, not transport of waste off site. (*Id.* at p. 292.)

In contrast, the record in this case is clear. Each and every discharge of pollutants by Standun into the environment at the OII landfill was the result of Standun's purposeful and regular shipment of its liquid wastes to the OII landfill. There were no sudden and accidental discharges of Standun's pollutants into the landfill. Standun again relies on subsequent sudden and

accidental discharges of toxic gases and leachate which may have occurred at the landfill. These subsequent incidents are not the relevant discharges and merely contributed to the environmental contamination arising from the initial disposal of Standun's waste in the landfill.

## DISPOSITION

The judgment is affirmed. Fireman's Fund and Liberty Mutual are to recover their costs on appeal from Standun.

Turner, P. J., and Jackson, J.,* concurred.

Appellant's petition for review by the Supreme Court was denied July 8, 1998. Kennard, J., was of the opinion that the petition should be granted.

---

*Judge of the Los Angeles Superior Court assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.