1 Cal.Rptr.3d 516 (2003)
100 Cal.App.4th 139
WESTOIL TERMINALS CO., Inc., et al., Plaintiffs and Appellants,
v.
INDUSTRIAL INDEMNITY COMPANY, Defendant and Appellant.
No. B155544.
Court of Appeal, Second District, Division Two.
July 3, 2003.
*517 Christensen, Miller, Fink, Jacobs, Glaser, Weil & Shapiro, Peter C. Sheridan, Los Angeles, Paul F. Arentz and Robert A. Madison for Plaintiffs and Appellants.
Musick, Peeler & Garrett, Susan J. Field and Jennifer M. Kokes, Los Angeles, for Defendant and Appellant.
ASHMANN-GERST. J.
This is an appeal from the trial court's grant of summary judgment to an insurance *518 company, defendant Industrial Indemnity Company (Industrial). The trial court determined that Industrial had no duty to defend its insureds, plaintiffs Westoil Terminals Co., Inc., and Westoil Terminals Co., L.P. (collectively, Westoil), against lawsuits brought by their lessee Western Fuel Oil (Western) and Western's successor in interest, Coastal Corporation (Coastal). The lawsuits sought damages arising out of an order to clean up groundwater contamination at property owned by Westoil. The trial court found, inter alia, no potential for coverage under the comprehensive general liability policy at issue, based upon a qualified pollution exclusion (QPE) in Industrial's policy.
We affirm. The trial court properly granted Industrial's motion for summary judgment pursuant to the QPE in Industrial's policy. In so holding, we do not reach the remaining issues in Westoil's appeal or the issues raised by Industrial in its cross-appeal.

FACTUAL AND PROCEDURAL BACKGROUND

Westoil's and Coastal's Operations and the Groundwater Contamination
From 1950 to 1974, Westoil owned and operated a tank farm for the storage and transfer of chemicals, fuels, and other liquid commodities at its facility. In 1974, Westoil leased the facility to Coastal, which operated the facility until 1996, when it was closed for remediation.
In 1985, the California Regional Water Quality Control Board for Los Angeles issued a clean-up and abatement order, requiring Coastal to investigate the groundwater contamination and formulate and implement a long-range remediation plan to remove the source of the groundwater contamination.
In August 1995, Coastal demanded $600,000 from Westoil for clean-up expenditures. It also demanded monies for future costs associated with cleaning up the contamination of the groundwater at the facility.

The Underlying Lawsuits and Settlement
On December 1, 1995, Coastal sued Westoil in federal court for allegedly contaminating the groundwater underneath the property leased to Coastal. Thereafter, in January 1996, Westoil was named in a cross-complaint brought by Coastal in a state court action, alleging substantially the same claims as were asserted in the federal court complaint.
On January 10, 1996, Westoil notified Industrial of Coastal's claims in both the federal and state court actions.
Approximately 10 months later, on November 14, 1996, Westoil demanded that Industrial defend and indemnify it against Coastal's claims. In response, on December 30, 1996, Industrial refused. It specifically denied Westoil's claim on the ground that there was no evidence or "contention that any property damage occurred during the policy period." However, Industrial also specifically "reserve[d] all of its rights under the terms, conditions and exclusions contained in its policies for the above-referenced claim."
In July 1997, Westoil settled with Coastal. Under the settlement, Westoil incurred over $11 million in damages for indemnity and defense costs.

Industrial's Insurance Policy
On July 1, 1984, Industrial issued an insurance policy providing comprehensive general liability (CGL) insurance to Westoil from July 1, 1984, through July 1, 1987. The policy contains general CGL language regarding insurance coverage. *519 Specifically, it provides that Industrial "will pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of ... bodily injury, or ... property damage to which this insurance applies, caused by an occurrence, and the Company shall have the right and duty to defend any suit against the insured seeking damages on account of such bodily injury or property damage." "Occurrence" is defined in the policy as "an accident, including continuous or repeated exposure to conditions, which results in bodily injury or property damage neither expected nor intended from the standpoint of the insured." "Property damage" is defined as "(1) physical injury to or destruction of tangible property which occurs during the policy period, including the loss of use thereof at any time resulting therefrom, or (2) loss of use of tangible property which has not been physically injured or destroyed provided such loss of use is caused by an occurrence during the policy period."
The policy also contains two separate pollution exclusions, attached and signed as separate endorsements to the Industrial policy. The original pollution exclusion is a QPE and was effective from July 1,1984, through November 1, 1986. It excludes coverage for property damage arising out of the discharge of pollutants unless "a sudden, unexpected and unintended discharge, dispersal, release or escape takes place during the policy period and causes bodily injury or damage to tangible property during the policy period." On November 1, 1986, the policy was "amended to exclude coverage for all property damage and clean-up costs caused by the discharge of pollutantsan absolute pollution exclusion.

The Instant Lawsuit
In November 1996, Westoil filed the instant lawsuit for breach of contract, tortious breach of the covenant of good faith and fair dealing, and declaratory relief against several of its insurers (but not Industrial). On August 18, 2000, Westoil filed and served its fourth amended complaint, the operative pleading, alleging breach of contract and breach of the implied covenant of good faith and fair dealing against Industrial.[1]
On August 24, 2001, Industrial filed a motion for summary judgment, or in the alternative, summary adjudication. Industrial alleged that it had no duty to defend or indemnify Westoil "on the ground that the pollution exclusions incorporated in Industrial's policy preclude any such duty."
Westoil opposed the motion, urging that Industrial was not entitled to summary judgment based upon the QPE. Specifically, Westoil argued that pursuant to Montrose Chemical Corp. v. Admiral Ins. Co. (1995) 10 Cal.4th 645, 42 Cal.Rptr.2d 324, 913 P.2d 878 {Montrose II), insurance "policies do not impose, as a condition of coverage, a requirement that the damage or injury be discovered at any particular point in time. Rather, under the Continuous Trigger Doctrine, if the injury continues beyond the end of one insurer's policy period all subsequent insurers are also liable for defense and potential indemnity costs as long as the injury is ongoing during the subsequent policy periods."
On December 3, 2001, the trial court granted Industrial's motion. Specifically, the trial court found that Industrial did not owe Westoil a duty to defend pursuant to *520 the QPE, "precluding claims which did not occur `during the policy period.'"
Westoil's timely appeal followed. Industrial also filed a protective cross-appeal challenging the trial court's orders (1) allowing Westoil leave to amend its fourth amended complaint to add Industrial as a Doe defendant, and (2) denying Industrial's demurrer to the breach of the implied covenant cause of action in the fourth amended complaint.

DISCUSSION

I. Standard of Review

"A trial court properly grants summary judgment where no triable issue of material fact exists and the moving party is entitled to judgment as a matter of law. (Code Civ. Proc., § 437c, subd. (c).) We review the trial court's decision de novo." (Merrill v. Navegar, Inc. (2001) 26 Cal.4th 465, 476, 110 Cal.Rptr.2d 370, 28 P.3d 116; see also Aguilar v. Atlantic Richfield Co. (2001) 25 Cal.4th 826, 843, 107 Cal.Rptr.2d 841, 24 P.3d 493.) If, in deciding this appeal, we find there is no issue of material fact, we affirm the summary judgment if it is correct on any legal ground applicable to this case, whether that ground was the legal theory adopted by the trial court or not, and whether it was raised by defendant in the trial court or first addressed on appeal. (Western Mutual Ins. Co. v. Yamamoto (1994) 29 Cal.App.4th 1474, 1481, 35 Cal.Rptr.2d 698.) If, on the other hand, we find that one or more triable issues of material fact exist, then we must reverse the judgment.
Similarly, we apply the de novo standard of review to the interpretation of Industrial's insurance policy. "The interpretation of an insurance contract, as with that of any written instrument, is primarily a judicial function. [Citation.] Unless the interpretation of the instrument turns upon the credibility of conflicting extrinsic evidence, a reviewing court makes an independent determination of the policy's meaning." (Cooper Companies v. Transcontinental Ins. Co. (1995) 31 Cal.App.4th 1094, 1100, 37 Cal.Rptr.2d 508.)
Exercising our independent judgment as to the legal effect of the undisputed facts (Spitler v. Children's Institute International (1992) 11 Cal.App.4th 432, 439, 14 Cal.Rptr.2d 197) and acknowledging the obligation to affirm on any ground supported by the record (Becerra v. County of Santa Cruz (1998) 68 Cal.App.4th 1450, 1457, 81 Cal.Rptr.2d 165), we conclude that summary judgment properly was granted.

II. The Trial Court Did Not Err in Finding No Duty to Defend

A. Interpretation of Insurance Contracts

"`While insurance contracts have special features, they are still contracts to which the ordinary rules of contractual interpretation apply.' [Citations.] `The fundamental goal of contractual interpretation is to give effect to the mutual intention of the parties. [Citation.]' [Citation.] `Such intent is to be inferred, if possible, solely from the written provisions of the contract.' [Citation.] `If contractual language is clear and explicit, it governs. [Citation.]' [Citation.] Moreover, if the policy's terms are `"used by the parties in a technical sense or a special meaning is given to them by usage,"' this use or meaning `controls judicial interpretation.' [Citation.]" (La Jolla Beach & Tennis Club, Inc. v. Industrial Indemnity Co. (1994) 9 Cal.4th 27, 37, 36 Cal.Rptr.2d 100, 884 P.2d 1048.)
"`"An insurance policy provision is ambiguous when it is capable of two or more constructions, both of which are reasonable."' [Citations.] `Courts will not *521 adopt a strained or absurd interpretation in order to create an ambiguity where none exists.' [Citation.] `"[L]anguage in a contract must be construed in the context of that instrument as a whole, and in the circumstances of that case, and cannot be found to be ambiguous in the abstract."' [Citations.] If an asserted ambiguity is not eliminated by the language and context of the policy, courts then invoke the principle that ambiguities are generally construed against the party who caused the uncertainty to exist (i.e., the insurer) in order to protect the insured's reasonable expectation of coverage. [Citations.]" (La Jolla Beach & Tennis Club, Inc. v. Industrial Indemnity Co., supra, 9 Cal.4th at pp. 37-38, 36 Cal.Rptr.2d 100, 884 P.2d 1048.)
Although insuring clauses normally are interpreted broadly (Montrose II, supra, 10 Cal.4th at p. 667, 42 Cal. Rptr.2d 324, 913 P.2d 878) and exclusions strictly are construed (Delgado v. Heritage Life Ins. Co. (1984) 157 Cal.App.3d 262, 271, 203 Cal.Rptr. 672), "where an exclusion is clear and unambiguous, it is given its literal effect." (Croskey et al., Cal. Practice Guide: Insurance Litigation (The Rutter Group 2003) ¶4:54.10, p. 4-22.) And, while exceptions to exclusions are "somewhat analogous to coverage provisions" and thus are interpreted broadly (National Union Fire Ins. Co. v. Lynette C. (1991) 228 Cal.App.3d 1073, 1082, 279 Cal.Rptr. 394), they are still subject to the same rules of policy interpretation, i.e., we first look "to the language of the contract in order to ascertain its plain meaning." (Waller v. Truck Ins. Exchange, Inc. (1995) 11 Cal.4th 1, 18, 44 Cal.Rptr.2d 370, 900 P.2d 619 (Waller).)
Mindful of these guiding principles, we note that CGL policies provide for broad coverage and cover all claims that fall within the terms of the insuring agreement unless those claims are specifically excluded. (Waller, supra, 11 Cal.4th at p. 16, 44 Cal.Rptr.2d 370, 900 P.2d 619; see also Croskey et al., Cal. Practice Guide: Insurance Litigation, supra, ¶ 7:328, p. 7A-88.1.) "CGL policies have two principal parts: the insuring clauses, which state the risk or risks covered by the policy; and the exclusions, which remove coverage for risks that would otherwise fall within the insuring clauses. [¶] Before even considering exclusions, [we] must examine the insuring clauses to determine whether a claim falls therein." Id., ¶ 7:9.1, p. 7A-6.) Only if the occurrence appears to be covered do we then turn to the exclusions.
The insuring agreement herein provides coverage for "property damage ... caused by an occurrence." "Occurrence" is defined as "an accident, including continuous or repeated exposure to conditions, which results in ... property damage neither expected nor intended from the standpoint of the insured." "Property damage" is defined as "(1) physical injury to or destruction of tangible property which occurs during the policy period, including the loss of use thereof at any time resulting therefrom, or (2) loss of use of tangible property which has not been physically injured or destroyed provided such loss of use is caused by an occurrence during the policy period."
In Montrose II, supra, 10 Cal.4th at page 645, 42 Cal.Rptr.2d 324, 913 P.2d 878, our California Supreme Court considered identical language in a standard CGL policy. The insurer agreed "to `pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of ... bodily injury, or ... property damage to which this insurance applies, caused by an occurrence....' *522 (Italics added.) `[P]roperty damage to which this insurance applies' is defined in [the insurer's] policies as `(1) physical injury to or destruction of tangible property which occurs during the policy period, including the loss of use thereof at any time resulting therefrom....' (Italics added.)" (Id. at p. 668, 42 Cal.Rptr.2d 324, 913 P.2d 878, fn. omitted.)
"Furthermore, `occurrence' is defined in [the insurer's] policies as `an accident, including continuous or repeated exposure to conditions, which results in bodily injury or property damage neither expected nor intended from the standpoint of the insured.' (Italics added.) When read together with the aforementioned clauses defining covered bodily injury and property damage, this policy language unambiguously distinguishes between the causative eventan accident or `continuous and repeated exposure to conditions'and the resulting `bodily injury or property damage.' It is the latter injury or damage that must `occur' during the policy period and `which results' from the accident or `continuous and repeated exposure to conditions.'" (Montrose II, supra, 10 Cal.4th at p. 669, 42 Cal.Rptr.2d 324, 913 P.2d 878.)
Here, like the definition in the insurance policy at issue in Montrose II, the term "occurrence" in Industrial's policy is defined as "an accident, including continuous or repeated exposure to conditions, which results in bodily injury or property damage neither expected nor intended from the standpoint of the insured" Similarly, "property damage" is defined as "physical injury to or destruction of tangible property which occurs during the policy period." Standing alone (as in Montrose II), this language suggests that only the property damage must occur during Industrial's policy period to give rise to a duty to defend. (See Croskey et al, Cal. Practice Guide: Insurance Litigation, supra, ¶ 7:43.1, p. 7A-14.) After all, unlike "property damage," "occurrence" is not defined in terms of timing; there is no requirement in the general CGL definitions that an "occurrence" take place during the policy period.
However, our deference to the Montrose II analysis cannot stop here. Unlike the policy at issue in Montrose II, Industrial's policy contains a QPE, which expressly excludes coverage for any pollution damage unless such damage is caused by a "sudden, unexpected and unintended discharge, dispersal, release or escape [of contaminants that] takes place during the policy period and causes bodily injury or damage to tangible property during the policy period." In other words, the QPE narrows the scope of coverage for pollution occurrences and requires that they occur during the policy period in order to give rise to coverage. Thus, this language establishes that the exception to the QPE does not apply unless both the release of contaminants and the damage occur during Industrial's policy period.
Our conclusion is not inconsistent with Montrose II. The Montrose II court did not consider a pollution exclusion in the policy. (Standun, Inc. v. Fireman's Fund Ins. Co. (1998) 62 Cal.App.4th 882, 892, 73 Cal.Rptr.2d 116, citing Montrose Chemical Corp. v. Superior Court (1993) 6 Cal.4th 287, 293, 24 Cal.Rptr.2d 467, 861 P.2d 1153 (Montrose I).) Thus, the court's discussion of the continuous trigger doctrine and its interpretation of "property damage during the policy period" is incomplete as it pertains to the instant context. (See also Croskey et al., Cal. Practice Guide: Insurance Litigation ¶ 7:2051, p. 7H-28; § 7:2059, pp. 7H-28.1 to 7H-28.2 [noting that even if coverage otherwise exists, an *523 insurer may avoid liability pursuant to exclusions in the policy, including pollution exclusions].)
Moreover, regardless of the court's interpretation of the insurance policy at issue in Montrose II, "if the policy expressly provides when coverage is `triggered,' such language will be determinative." (Croskey et al., Cal. Practice Guide: Insurance Litigation ¶ 7:43.5, pp. 7A-14 to 7A-15, citing Borg v. Transamerica Ins. Co. (1996) 47 Cal.App.4th 448, 461-462, fn. 5, 54 Cal. Rptr.2d 811.) Nothing in Montrose II precludes an insurer from limiting coverage for pollution damages to occurrences that take place "`during the policy period.'" In fact, the Montrose II court expressly noted that it only was interpreting the phrase "property damage ... which occurs during the policy period," leaving open, for example, the issue of when coverage is triggered for "loss of use" damages. (Montrose II, supra, 10 Cal.4th at p. 668, 42 Cal.Rptr.2d 324, 913 P.2d 878, fn. 12 ["The policy definition of `property damage to which this insurance applies' also includes 'loss of use of tangible property which has not been physically injured or destroyed provided such loss of use is caused by an occurrence during the policy period.' Since the `loss of use' clause pertains only to property `which has not been physically injured or destroyed,' the sustaining of damage or injury to such property during the policy period by definition cannot be what triggers coverage for such losses. Because the parties have not directed us to any `loss of use' issue in this case, we have no occasion to decide whether coverage, under such a policy, for loss of use of tangible property which has not been physically injured or destroyed is dependent upon whether the loss of use of the property occurs during the policy period, or whether the occurrence which results in the loss of use occurs during the policy period."].) It follows that the Montrose II holding does not bar the interpretation of a specific policy provision (or exclusion) limiting coverage to when the event, not damage, occurs.
In fact, insurers often limit coverage in exclusions despite broad general coverage provisions. For example, CGL policies typically obligate insurers to pay for all property "damages," a term courts have held to include CERCLA[2] response costs. (Croskey et al., Cal. Practice Guide: Insurance Litigation ¶ 7:150, p. 7A-51; 7:154, p. 7A-52; §§ 7:2019 to 7:2020, pp. 7A-18 to 7A-19.) However, insurers can and have excluded coverage for such costs in enforceable exclusion provisions. (Croskey et al., Cal. Practice Guide: Insurance Litigation, supra, ¶ 7:156, pp. 7A-52 to 7A-53, § 7:2024, pp. 7H-20 to 7H-21.)
Similarly, the broad language in Industrial's policy, interpreted in light of Montrose II, typically would obligate Industrial to cover Westoil's claim for damages which occurred during the policy period, regardless of when the release of pollutants occurred. However, Industrial could and did limit its liability by amending the policy to exclude coverage for pollution damage unless such damage "takes place during the policy period ... and causes ... damage to tangible property during the policy period." Such an endorsement is valid, enforceable, and defeats Westoil's reliance upon Montrose II.[3]

*524 1. Alleged Ambiguity in Industrial's Policy

Westoil alleges that even if we adopt Industrial's interpretation of the insurance policy, at a minimum, the insurance policy is ambiguous because a conflict exists between the term "occurrence" and the QPE. We disagree. Industrial's policy provides that it "will pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of ... property damage to which this insurance applies, caused by an occurrence." "Property damage" is defined, in relevant part, as "physical injury to or destruction of tangible property which occurs during the policy period ... or ... loss of use of tangible property which has not been physically injured or destroyed provided such loss of use is caused by an occurrence during the policy period." Pursuant to Montrose II, supra, 10 Cal.4th at page 668, 42 Cal.Rptr.2d 324, 913 P.2d 878, standing alone, this language "clearly and explicitly provides that the occurrence of bodily injury or property damage during the policy period is the operative event that triggers coverage."
The QPE does not conflict with these defined phrases. Rather, as a separate endorsement, the QPE provides a permissible exclusion on coverage: coverage is excluded for property damage arising out of the release of pollutants unless "a sudden ... discharge ... takes place during the policy period and causes ... damage to tangible property during the policy period." In this regard, "[t]he pollution exclusion focuses on the discharge of pollutants into or upon the land, air or water and not on the environmental damage caused by the discharge." (Standun, Inc. v. Fireman's Fund Insurance Co., supra, 62 Cal. App.4th at p. 890, 73 Cal.Rptr.2d 116.) "The fact the policy's general definition of the term [property damage] encompasses [losses during the policy period] does not set up a fatal inconsistency or ambiguity because in another section of the policy coverage is excluded for certain ... injuries, including [damages as a result of the release of pollutants during the policy period]. An insurance policy may exclude coverage for particular injuries or damages in certain specified circumstances while providing coverage in other circumstances." (Frank and Freedus v. Allstate Insurance Co. (1996) 45 Cal.App.4th 461, 471, 52 Cal. Rptr.2d 678.) In other words, while Industrial's policy might generally provide for coverage for "property damage" which occurs during the policy period (regardless of when the event causing the damage occurred), the QPE limits that coverage and excludes coverage as to pollutants unless a "sudden ... release [of contaminants] ... takes place during the policy period" as well as "causes damage to tangible property during the policy period." It follows that there is no reasonable ambiguity which warrants reversal of the trial court's order. (Waller, supra, 11 Cal.4th at pp. 18-19, 44 Cal.Rptr.2d 370, 900 P.2d 619.)
In fact, adopting Westoil's argument would render the QPE meaningless. (Titan Corp. v. Aetna Casualty & Surety Co. (1994) 22 Cal.App.4th 457, 474-475, 27 Cal. Rptr.2d 476.) The QPE excludes coverage for property damage stemming from the release of pollutants. The only exception to this exclusion is "if a sudden ... discharge ... takes place during the policy period and causes ... damage ... during the policy period." By asking us to conclude that this exception actually means that only the damage occur during the policy period (despite the plain language to the contrary), Westoil seeks to have the exception swallow up the exclusion.

2. Waiver and Estoppel

Westoil also asserts that Industrial waived and/or is estopped from relying *525 upon the QPE because it never investigated Weston's claim after it tendered its defense to Industrial. "`"[W]aiver is the intentional relinquishment of a known right after knowledge of the facts." [Citations.] The burden ... is on the party claiming a waiver of a right to prove it by clear and convincing evidence that does not leave the matter to speculation, and "doubtful cases will be decided against a waiver" [citation].'" (Waller, supra, 11 Cal.4th at p. 31, 44 Cal.Rptr.2d 370, 900 P.2d 619.) In the insurance context, "`California courts will find waiver when a party intentionally relinquishes a right or when that party's acts are so inconsistent with an intent to enforce the right as to induce a reasonable belief that such right has been relinquished.'" (Id. at pp. 33-34, 44 Cal.Rptr.2d 370, 900 P.2d 619.) For example, "an insurer waives defenses to coverage not asserted in its denial only if the insured can show misconduct by the insurer or detrimental reliance by the insured." (Id. at p. 33, 44 Cal.Rptr.2d 370, 900 P.2d 619.) "Application of the waiver rule to disputes over whether coverage exists is designed as an incentive to compel an insurance company to fulfill its duty to thoroughly investigate a claim before denying coverage." (Alta Cal. Regional Center v. Fremont Indemnity Co. (1994) 25 Cal.App.4th 455, 465, 30 Cal.Rptr.2d 841, disapproved on other grounds in Waller, supra, 11 Cal.4th at p. 34, 44 Cal.Rptr.2d 370, 900 P.2d 619.)
Here, Westoil cannot establish that Industrial waived its right to assert the QPE as a defense. In its December 30, 1996, letter to Westoil denying Westoil's request for a defense, Industrial specifically "reserve[d] all of its rights under the terms, conditions and exclusions contained in its policies," thereby evidencing its intent not to waive any defense, including one based upon the QPE. (Waller, supra, 11 Cal.4th at p. 33, 44 Cal.Rptr.2d 370, 900 P.2d 619 ["A holding that an insurer waives defenses not asserted in its initial denial of a duty to defend would be inconsistent with established waiver principles by erroneously implying an intent to relinquish contract rights where no such intent existed."].) Moreover, other than generally citing to almost 300 pages in the appellate record, Westoil directs us to no evidence demonstrating that Industrial failed to investigate "into some basis to assert the defense." Under these circumstances, we cannot find that Industrial waived its right to assert a defense pursuant to the QPE.
Similarly, Westoil's estoppel theory fails. "Whenever a party has, by his own statement or conduct, intentionally and deliberately led another to believe a particular thing true and to act upon such belief, he is not, in any litigation arising out of such statement or conduct, permitted to contradict it." (Evid.Code, § 623.) The object of estoppel is "to `prevent a person from asserting a right which has come into existence by contract, statute or other rule of law where, because of his conduct, silence or omission, it would be unconscionable to allow him to do so.' [Citation.] An estoppel may arise from silence when there is a duty to speak. [Citations.]" (Skulnick v. Roberts Express, Inc. (1992) 2 Cal.App.4th 884, 891, 3 Cal.Rptr.2d 597.) An insurer may be estopped to deny that coverage exists where the "insurer's conduct [has] caused either (1) a `reasonable' belief that [the] insurer was providing coverage or (2) any detrimental reliance on such conduct, both of which are essential to an estoppel claim." (State Farm Fire & Casualty Co. v. Jioras (1994) 24 Cal.App.4th 1619, 1627-1628, 29 Cal.Rptr.2d 840.)
For the same reasons set forth above, we conclude that Industrial is not estopped from asserting the QPE as a defense to *526 Westoil's demand for a defense. Again, Westoil presents no evidence that Industrial intended for Westoil to believe that it would not enforce the QPE. Rather, it expressly reserved its right to assert any defense, based upon any exclusion, in its December 30, 1996, letter denying a duty to defend. Moreover, as pointed out by Industrial, Westoil does not provide any evidentiary support, including citations to the appellate record, for its claim that it detrimentally relied upon Industrial's alleged decision not to enforce the QPE. (Ehrler v. Ehrler (1981) 126 Cal.App.3d 147, 154, 178 Cal.Rptr. 642 ["There is no authority ... for us to review `evidence' that purportedly is contained in the briefs."]; see also Cal. Rules of Court, rule 15(a); Pringle v. La Chapelle (1999) 73 Cal.App.4th 1000, 1003, 87 Cal.Rptr.2d 90 [the appellant is required to cite to specific portions of the record in the appellate briefs].)

3. Conclusion

In sum, we conclude that under the plain language of the QPE, the pollution exclusion in the insurance policy does not apply only if a sudden discharge of contaminants takes place during the policy period and causes damage during the policy period. Applying this definition, we turn to the issue of whether Industrial had a duty to defend Westoil against Coastal's claims.

B. Duty to Defend

The principles governing determination of an insurer's duty to defend are well established, and were reiterated in Horace Mann Ins. Co. v. Barbara B. (1993) 4 Cal.4th 1076, 1081, 17 Cal.Rptr.2d 210, 846 P.2d 792: "[A] liability insurer owes a broad duty to defend its insured against claims that create a potential for indemnity. [Citation.] As we said in Gray [v. Zurich Ins. Co. (1966) 65 Cal.2d 263, 275], [54 Cal.Rptr. 104, 419 P.2d 168], `the carrier must defend a suit which potentially seeks damages within the coverage of the policy.' [Citation.] Implicit in this rule is the principle that the duty to defend is broader than the duty to indemnify; an insurer may owe a duty to defend its insured in an action in which no damages ultimately are awarded. [Citations.] [¶] The determination whether the insurer owes a duty to defend usually is made in the first instance by comparing the allegations of the complaint with the terms of the policy. Facts extrinsic to the complaint also give rise to a duty to defend when they reveal a possibility that the claim may be covered by the policy. [Citation.]" (See also Montrose I, supra, 6 Cal.4th at p. 300, 24 Cal.Rptr.2d 467, 861 P.2d 1153; County of San Bernardino v. Pacific Indemnity Co. (1997) 56 Cal. App.4th 666, 688, 65 Cal.Rptr.2d 657.)
However, "the obligation to defend is not without limits. (Gray v. Zurich Insurance Co., supra, 65 Cal.2d at pp. 274-275, [54 Cal.Rptr. 104, 419 P.2d 168].) Rather, such a duty is limited by `the nature and kind of risk covered by the policy.' (Id. at p. 275, [54 Cal.Rptr. 104, 419 P.2d 168], italics added.) For example, `the insured could not reasonably expect protection under an automobile insurance policy for injury which occurs from defect in a stairway.' (Id. at p. 274, [54 Cal.Rptr. 104, 419 P.2d 168]; [citations].) [¶] ... [¶] Alternatively in Gray, we held that there was also a duty to defend whenever the underlying action potentially sought damages covered by the indemnity provisions of the policy. (Gray v. Zurich Insurance Co., supra, 65 Cal.2d at pp. 275, 277, [54 Cal.Rptr. 104, 419 P.2d 168]; Montrose Chemical Corp. v. Superior Court, supra, 6 Cal.4th at p. 299, [24 Cal.Rptr.2d 467, 861 P.2d 1153].) ... [¶] We recognized, however, that `the insurer need not defend if the third party complaint can by no conceivable theory *527 raise a single issue which could bring it within the policy coverage.' (Gray v. Zurich Insurance Co., supra, 65 Cal.2d at p. 276, fn. 15, [54 Cal.Rptr. 104, 419 P.2d 168]; Montrose Chemical Corp. v. Superior Court, supra, 6 Cal.4th at p. 300, [24 Cal.Rptr.2d 467, 861 P.2d 1153].)" (La Jolla Beach & Tennis Club, Inc. v. Industrial Indemnity Co., supra, 9 Cal.4th at p. 39, 36 Cal.Rptr.2d 100, 884 P.2d 1048.) In other words, if "there is no potential for coverage, the insurer may refuse to defend the lawsuit." (Gunderson v. Fire Ins. Exchange (1995) 37 Cal.App.4th 1106, 1114, 44 Cal.Rptr.2d 272.)
Here, there is no potential for coverage in light of the plain policy language, as discussed above. First, considering the allegations in Coastal's federal court complaint, Coastal "allege[d] that during Westoil's operation of the storage and transfer facility, Westoil's acts and practices allowed hazardous substances ... to leak or spill from the storage tanks or accompanying pipelines onto and under the Property and adjacent property." Similarly, in its state court cross-complaint, Coastal "allege[d] that during Westoil's operation of the storage and transfer facility, Westoil's acts and practices allowed pollutants and contaminants to leak or spill from the storage tanks or accompanying pipelines onto and under the Property and adjacent property." As the trial court properly found, these allegations establish that Coastal sought damages for alleged negligence only during the time Westoil was operating the facility, before 1974 (when Coastal assumed operations of the facility), 10 years before the Industrial policy first became effective. Under these circumstances, we cannot interpret Coastal's complaint and cross-complaint as seeking damages for the release of contaminants (whether sudden or not) "during the policy period."
Second, there is no extrinsic evidence that Coastal sought damages for Westoil's negligent conduct during the policy period, which would have given rise to a potential for coverage and a corresponding duty to defend. Coastal, not Westoil, was operating the facility during the time the Industrial policy was effective. There is no evidence that Westoil was engaged in any negligent conduct during the relevant time period, giving rise to an indemnity claim by Coastal.
In its reply brief, Westoil asserts that "if Coastal abandoned the site and the ongoing remediation," it, as owner of the property, could potentially be liable for damages associated with the groundwater contamination and, under those facts, Industrial "would have been obligated to provide coverage." Westoil's speculative claim is insufficient to give rise to a duty to defend. (Hurley Construction Co. v. State Farm Fire & Casualty Co. (1992) 10 Cal.App.4th 533, 538, 12 Cal.Rptr.2d 629; see also Croskey et al., Cal. Practice Guide: Insurance Litigation ¶ 7:577, pp. 7B-21 to 7B-22.) All that matters for purposes of determining whether there is a duty to defend is the facts known to the insurer. (Hurley Construction Co. v. State Farm Fire & Casualty Co., supra, at p. 538, 12 Cal.Rptr.2d 629.) Here, at the time Industrial denied Westoil's demand for a defense in December 1996, the only facts known to Industrial regarding its potential liability were (1) the allegations in Coastal's complaint and cross-complaint, and (2) the absence of any extrinsic evidence giving rise to a duty to defend. For the reasons previously mentioned, these facts compel the conclusion that Industrial did not owe Westoil a duty to defend. Absent supporting evidence, Coastal's *528 speculation to the contrary is insufficient to defeat these facts. (Ibid.)
In light of Coastal's allegations against Westoil that it only sought damages for the time in which Westoil operated the facility and the absence of extrinsic evidence indicating otherwise, it is clear that Coastal only sought damages for negligence which occurred well before the time Industrial's policy was in place. Accordingly, there was no potential for coverage, and Industrial did not have a duty to defend Westoil against Coastal's allegations.

III. Westoil's Other Claims and Industrial's Cross-Appeal

Absent a duty to defend, Westoil cannot sustain its causes of action for breach of contract and/or breach of the implied covenant of good faith and fair dealing. (Waller, supra, 11 Cal.4th at pp. 36-37, 44 Cal.Rptr.2d 370, 900 P.2d 619.) Accordingly, the trial court properly granted Industrial's motion for summary judgment. It follows we need not address Westoil's other claims asserted on appeal, including whether the trial court properly considered the testimony of the former employees in the underlying litigation and whether Golden Eagle Refinery Co. v. Associated Internat. Ins. Co. (2001) 85 Cal.App.4th 1300, 102 Cal.Rptr.2d 834 applies to the facts of this case, nor the issues raised in Industrial's cross-appeal.

DISPOSITION
The judgment of the trial court is affirmed. Industrial is entitled to its costs on appeal.
We concur: NOTT, Acting P.J., and DOI TODD, J.
NOTES
[1] Westoil successfully added Industrial to the fourth amended complaint after the trial court granted its motion for leave to amend the pleading to add Industrial as a Doe defendant, pursuant to Code of Civil Procedure section 474.
[2] Comprehensive Environmental Response, Compensation and Liability Act (42 u.S.C. § 9601 etseq.).
[3] If Westoil wanted coverage for all damage caused by pollution, it could have negotiated and paid for a different insurance policy to cover such losses. (See, e.g., Croskey et al Cal. Practice Guide: Insurance Litigation (The Rutter Group 2002) ¶¶ 7:1997 to 7:2007.10, pp. 7H-11 to 7H-15.)