[No. B207878. Second Dist., Div. Eight. Aug. 4, 2009.]

NORTH AMERICAN CAPACITY INSURANCE COMPANY, Plaintiff and Appellant, v.
CLAREMONT LIABILITY INSURANCE COMPANY, Defendant and Respondent.

274

**COUNSEL**

Grimm, Vranjes, McCormick & Graham, A. Carl Yaeckel and Charles A. Phillips for Plaintiff and Appellant.

Selman Breitman, Sheryl W. Leichenger, Eldon S. Edson and Tam T. Glunt for Defendant and Respondent.

**OPINION**

**FLIER, J.—**

## INTRODUCTION

This is an action for equitable contribution between two insurers. North American Capacity Insurance Company (NAC) seeks equitable contribution from Claremont Liability Insurance Company (Claremont) for NAC's alleged overpayment towards settlement of an underlying action against their mutual

insured, general contractor JD Group, Inc. (JDG). The two insurers paid a total of $1.1 million on JDG's behalf as part of a $2.2 million global settlement of a property owner's underlying action for defective construction of a home. Of the $1.1 million settlement sum paid on JDG's behalf, NAC paid $800,000 and Claremont contributed $300,000. NAC brought the present action claiming Claremont did not contribute its equitable share of the settlement under their respective policies of insurance.

The court found after a bench trial that $909,574 of the $1.1 million settlement was covered solely under NAC's policy and $190,426 was covered by both policies. Of the $190,426 covered by both policies, the court allocated responsibility for payment between the two insurers according to their proportionate "time on the risk," which is the period of time that elapsed between the date the underlying construction project was completed and the date coverage under the final policy, which was issued by NAC, expired. Based on time on the risk, the court calculated NAC had responsibility to pay $150,398.45 and Claremont had responsibility to pay $40,027.55 of the $190,426 amount. Under these calculations, the court found NAC responsible to pay a total of $1,059,972.45 and Claremont was responsible to pay $40,027.55 of the $1.1 million the two carriers collectively paid on JDG's behalf toward the global settlement. Because NAC had contributed only $800,000, which was less than its share of responsibility under the court's calculations, the court denied NAC any recovery on its complaint for equitable contribution against Claremont, resulting in this appeal.

The allocation of $909,574 to NAC is at the heart of this appeal. The court allocated this sum solely to NAC largely because a "contractors warranty endorsement" in Claremont's primary policy excluded liability coverage for operations completed by an independent contractor unless the insured obtained both (1) a hold harmless agreement from the contractor, and (2) a certificate of insurance showing the contractor was insured. *In practical effect*, this endorsement shifted damages caused by the independent contractor to the contractor and its carrier, rather than JDG and Claremont, and placed the risk of the contractor's defective performance upon the contractor and its carrier. In the present instance, the court found that JDG retained a number of independent contractors who were responsible for $909,574 in damages but, because JDG had failed to comply with the contractors warranty endorsement for those contractors, Claremont was not responsible to pay for those damages.

We hold (1) substantial evidence supports the trial court's findings regarding the project completion date; (2) the court did not err in ruling that the contractors warranty endorsements in Claremont's policies were enforceable preconditions for coverage; and (3) coverage was not available under

Claremont's umbrella policy. Furthermore, substantial evidence supports the trial court's allocation of relative responsibility to the carriers, and the court properly exercised its discretion in setting the amounts of equitable contribution. We therefore affirm.

## FACTS

### 1. Construction of Home

JDG is a general contractor which agreed to build a large home in Los Angeles, California, for a property owner. Construction began in 1998, and JDG retained numerous independent contractors to assist in building the home. The final inspection by the city building and safety inspector took place in January 2001, and the city issued a certificate of occupancy for the residence on April 23, 2001.

The work called for under the construction contract was not timely completed, and JDG paid the homeowner liquidated damages from May 2001 to September 30, 2001. The owner and his family moved into the home about May 2001, while construction was still ongoing.[1]

A notice of completion for the construction project indicating a completion date of September 28, 2001, was executed and recorded by an agent of the homeowner.

### 2. Underlying Action

On January 5, 2005, the homeowner filed a complaint for breach of contract against JDG. The complaint alleged the residence, as built by JDG, contained numerous flaws and defects, including conditions that resulted or would result in leaks or water intrusion of the windows, roof and external walls.

### 3. Tender of Defense, Cross-complaint and Settlement of Underlying Action

#### A. Tender of Defense and Cross-complaint

NAC and Claremont insured JDG at different periods. Claremont issued to JDG a primary commercial general liability policy, as well as an excess/umbrella policy (umbrella policy), effective from January 9, 2001, to January 9, 2002. NAC issued to JDG a primary commercial general liability

---

[1] Work on the residence continued for some time past September 28, 2001. The owner testified by deposition that active construction of the residence continued for an additional year after he moved into the home in spring 2001.

policy effective from January 9, 2002, to January 9, 2003, and subsequently extended to January 31, 2003.

JDG tendered its defense of the underlying lawsuit to both carriers. Both NAC and Claremont agreed to defend JDG, subject to reservations of rights, under their primary policies. JDG appeared in the underlying action and filed a cross-complaint against its subcontractors seeking indemnity.

JDG also tendered its defense to Commercial Underwriters Insurance Company (CUIC), an insurer related to NAC. The CUIC policy provided commercial general liability coverage to JDG from January 9, 2000, to January 9, 2001. CUIC rejected JDG's tender of defense, however, and CUIC had no involvement in defending JDG in the underlying action. The grounds for CUIC's rejection, together with CUIC's relationship with NAC, were relevant to the trial below and are discussed more specifically, *post*.

### B.  *Defense and Settlement of Underlying Action*

The homeowner in the underlying action retained a roofing and waterproofing expert, Mark D. Vanderslice, to assist in prosecuting his claims against JDG. JDG in turn retained as a defense expert architect and general contractor Mark Savel, whose fees were paid jointly by NAC and Claremont. Savel developed an agreed-upon scope of repair based on Vanderslice's reports. After a mediation, a settlement was reached in the spring of 2007 between the homeowner, JDG and all but two of the subcontractors.

#### i.  Dispute Between NAC and Claremont over Exposure

During the mediation, NAC and Claremont agreed to split the settlement amount each would pay on the basis of "time on the risk."[2] However, NAC and Claremont could not agree on their respective time on the risk because of a dispute regarding the date of completion of the project. NAC contended Claremont's time on the risk began in May 2001, when the owner and his family moved into the home, because that allegedly met the definition of "Completed Operations" under the Claremont policy. Claremont, on the other hand, contended its policy was triggered by the recorded notice of completion indicating the work of improvement on the property was completed on September 28, 2001, because work continued on the residence even after the owner's family moved into the home.

Among other things, Claremont further contended its responsibility to pay was reduced by a contractors warranty endorsement contained in its

---

[2] A witness for Claremont's third party administrator defined "time on the risk" as "when the insured [has] completed all of its work in the contract and it was put to its intended use."

primary policy. NAC disputed the application of the endorsement and claimed Claremont's umbrella policy in any case covered any claims excluded by the primary policy.

### ii. Settlement of Underlying Action

Ultimately, with contributions from various subcontractors, the underlying action was settled for $2.2 million, with NAC paying $800,000 and Claremont contributing $300,000, a total of $1.1 million, on JDG's behalf.[3]

## PROCEDURAL HISTORY

### 1. *The Pleadings*

After the mediated settlement, NAC brought the present action for declaratory relief and equitable contribution against Claremont. NAC alleged Claremont did not pay its equitable share of the settlement of the underlying action.

Claremont in turn filed a cross-complaint for declaratory relief and equitable contribution against NAC.[4]

### 2. *Trial*

Both NAC and Claremont stipulated to a court trial. During the trial, neither party disputed it had a duty to defend JDG in the underlying action. The dispute centered upon when Claremont's policy was triggered and how the responsibility to pay the settlement was to be allocated between the two insurers.

### A. *Subject Policies*

Both parties stipulated to the admission of the policies in question into evidence.

### i. Claremont Commercial General Liability Policy

JDG's primary policy with Claremont contained a contractors warranty endorsement providing that coverage afforded by the policy "shall not apply" to operations performed by independent contractors unless the insured (1) *"has received* a written agreement from each and every independent

---

[3] Two subcontractors settled after the main settlement, concluding the underlying action.

[4] Claremont contended it had no obligation to defend and indemnify JDG under its umbrella policy and NAC had not paid an equitable share of the defense fees and costs in the underlying action. The issue of defense fees and costs was later settled by NAC's payment of $25,000 to Claremont.

contractor holding the insured harmless from all liabilities incurred by the independent contractor" and (2) *"has obtained* certificates of insurance from each and every independent contractor indicating that the independent contractor will maintain similar coverage as provided by this policy . . . ."[5] (Italics added.)

ii. Claremont Umbrella Policy

Claremont's umbrella policy contained a contractors warranty endorsement virtually identical to that of the primary policy, except that it provided the policy shall not apply to operations performed by independent contractors unless the insured (1) *"will receive* a written agreement from each and every independent contractor holding the insured harmless for all liabilities incurred by the independent contractor" and (2) *"will obtain* certificates of insurance from each and every independent contractor indicating that the independent contractor will maintain similar coverage as provided by this policy . . . ."[6] (Italics added.)

---

[5] The full contractors warranty endorsement in the Claremont primary policy provided, at the top of the page, "THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY." The endorsement set forth a "commercial general liability coverage part schedule" indicating an occurrence limit of $1 million, a products aggregate limit of $1 million and a general aggregate limit of $1 million. Below these amounts the following language appears: "In consideration of the premium charged, it is hereby understood and agreed that such coverage as is afforded by this policy shall not apply to operations performed by independent contractors unless: [¶] 1. The insured *has received* a written agreement from each and every independent contractor holding the insured harmless for all liabilities incurred by the independent contractor. [¶] 2. The insured *has obtained* certificates of insurance from each and every independent contractor indicating that the independent contractor will maintain similar coverage as provided by this policy and with limits as shown in the above schedule, unless otherwise agreed to in writing by the company. Failure of the independent contractor to maintain similar coverage as provided by this policy and with limits as shown in the above schedule shall not invalidate this policy but in the event of such failure, the company shall only be liable to the same extent as we would have been had the independent contractor maintained such coverage and limits of insurance." (Italics added.)

[6] The excess/umbrella contractors warranty endorsement contained the same warning in capitalized letters that the endorsement "changes the policy," listed the same schedule amounts ($1 million) with respect to occurrence limit, product aggregate limit and general aggregate limit and in substance read identically, except for the italicized portions as follows: "In consideration of the premium charged, it is hereby understood and agreed that such coverage as is afforded by this policy shall not apply to operations performed by independent contractors unless: [¶] 1. The insured *will receive* a written agreement from each and every independent contractor holding the insured harmless for all liabilities incurred by the independent contractor. [¶] 2. The insured *will obtain* certificates of insurance from each and every independent contractor indicating that the independent contractor will maintain similar coverage as provided by this policy and with limits as shown in the above schedule, unless otherwise agreed to in writing by the company. [¶] Failure of the independent contractor to maintain similar coverage as provided by this policy and with limits as shown in the above schedule shall not invalidate this policy but in the event of such failure, the company shall only be liable to the

### iii.  NAC Policy

As with the Claremont policies, the NAC commercial general liability policy also contained an independent contractors endorsement.[7]

### B.  *Evidence at Trial*

With respect to Claremont's contractors warranty endorsements, the parties agreed on the amount each subcontractor paid to settle the underlying action, whether the subcontractor had insurance, whether the subcontractor had provided a certificate of insurance to JDG and whether JDG had obtained a written "hold harmless," indemnity agreement from the subcontractor.

The parties stipulated that JDG failed to comply with the "hold harmless" provision in the contractors warranty endorsement for eight of the 13 subcontractors involved. Claremont introduced evidence that one subcontractor provided no certificate of insurance to JDG and the certificates of insurance for two more subcontractors showed on their face that coverage was on a "claims made" basis rather than on an "occurrence" basis as required in the Claremont policies. In short, it appeared that JDG had fully complied with the contractors warranty endorsement for only two of these subcontractors.

Claremont's witness testified it never agreed in writing to excuse compliance with the contractors warranty endorsement in either the primary or the umbrella policy. He also testified that Claremont's insured was required to comply with *both* the hold harmless requirement in paragraph 1 and the certificate of insurance requirement in paragraph 2.

Claremont further showed that, after JDG tendered its defense to NAC, a company called North American Specialty Insurance Company (NAS) accepted JDG's tender of defense on NAC's behalf. Although JDG also

same extent as we would have been had the independent contractor maintained such coverage and limits of insurance." (Italics added.)

[7] The NAC independent contractors endorsement reads at the top: "THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY." The endorsement states that "[t]his endorsement modifies insurance provided under the . . . [¶] COMMERCIAL GENERAL LIABILITY COVERAGE PART [¶] PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE PART" and provides: "It is agreed that contractors or sub-contractors performing work on your behalf shall have Commercial General Liability insurance in full force during the duration of the time work is performed on behalf of any insured. [¶] It is further agreed that: [¶] 1) You shall obtain Certificates of Insurance from all contractors or sub-contractors providing evidence of Commercial General Liability Insurance which provides coverage for such 'bodily injury', 'property damage', or 'personal and advertising injury' at limits at least equal to that afforded by this policy; and [¶] 2) Such Certificates of Insurance shall also specify that you are named as an additional insured under their policies. [¶] All other terms and conditions of this Policy remain unchanged."

tendered its defense to CUIC, NAS denied coverage on CUIC's behalf, asserting JDG and its subcontractors "were working on the house that you constructed for [the owner] *until the September 28, 2001 date of completion.*" (Italics added.) The NAS letter accepting JDG's tender of defense to *NAC* and the NAS letter rejecting JDG's tender to *CUIC* were both approved by the same supervisor at NAS. An assistant vice-president of NAS testified that both NAC and NAS were owned by Swiss Re, a company that also owned CUIC, and that NAS acted as claims administrator and made coverage determinations for CUIC.

The inspector who conducted the final inspection of the home for the city testified a certificate of occupancy only indicated "minimum requirements" of the building code had been met, and a certificate of occupancy did not necessarily indicate the dwelling was habitable. He stated that interior painting of the dwelling need not be completed to receive a certificate of occupancy; in the majority of single-family homes, carpeting or other flooring materials have not been installed. According to the inspector, a certificate of occupancy did not indicate whether a general contractor had completed all the work called for under its contract.

JDG's president testified that JDG paid the homeowner liquidated damages from May 2001 to September 30, 2001, because all of the work under the contract was not completed until September 30, 2001. He also stated some work continued after September 28, 2001.

### C. *Expert Evidence*

Claremont relied upon evidence assembled by expert Savel for the underlying litigation. Savel opined that certain subcontractors had relative responsibility for the construction defects as shown in a trial exhibit he prepared, based upon information his firm assembled in JDG's defense. Savel allocated the $1.1 million the insurers paid on JDG's behalf to each subcontractor in proportion to their percentages of responsibility. Savel did not allocate any responsibility to JDG for the $1.1 million settlement amount.

Savel testified he arrived at his opinion after reviewing reports prepared by the homeowner's experts, invoices, contracts and agreements from or with the subcontractors and material suppliers, transcripts of depositions, and results of destructive testing performed at the residence. He also based his opinion upon onsite inspections of the residence and meetings with other experts and consultants. Savel tracked each claimed defect, determined each subcontractor's involvement with the defect, and prepared a matrix to allocate responsibility for the defect. He or his company logged over 800 hours of research and analysis in the underlying action, and he relied on that analysis in assigning responsibility to the subcontractors in the present action.

NAC had the opportunity to cross-examine Savel at trial. On cross-examination, Savel testified that water intrusion constituted over 75 or 80 percent of the overall damage in the mediated scope of repair in the underlying action. Savel's analysis included 124 subcontractors, vendors or entities, and he allocated responsibility for construction defects to 13 of that number. Counsel for NAC also questioned Savel regarding his exclusion of certain subcontractors in his final allocation of responsibility.

NAC did not offer any expert testimony regarding allocation of responsibility for the construction defects.

### 3. *Proposed Statements of Decision*

After receiving evidence, the trial court directed each party to prepare a proposed statement of decision. The court gave each party 10 court days, to March 14, 2008, to prepare its proposed statement of decision and 14 days, to March 28, 2008, to object to the opposing party's proposed statement of decision.

Both parties timely submitted proposed statements of decision.

### 4. *Findings and Judgment*

On March 18, 2008, the court adopted and signed Claremont's proposed statement of decision without change and entered judgment on the same day.

By the preponderance of the evidence, the trial court found in favor of Claremont and against NAC on both the complaint and cross-complaint. As a matter of law, the court concluded the contractors warranty endorsement contained in the Claremont primary policy was enforceable and that it expressed preconditions to coverage. The court accordingly found NAC was not entitled to obtain contribution from Claremont under its primary policy. It additionally concluded that the contractors warranty endorsement in the Claremont umbrella policy was enforceable and expressed preconditions to coverage under that policy, and that the umbrella coverage did not "drop down" to provide primary coverage.

The trial court found Savel's testimony persuasive and credible. Using Savel's calculations, the trial court found that $909,574 of the $1.1 million settlement was not covered under the Claremont primary policy. On the other hand, the trial court found the entire $1.1 million settlement payment fell within the coverage of the NAC primary policy. Thus, the court found only $190,426 of the $1.1 million settlement payment was covered under both the Claremont and NAC primary policies.

The court additionally found that Claremont's time on the risk, measured by a project completion date of September 28, 2001, and a policy expiration date of January 9, 2002, was 21.02 percent (103 days/490 days) and NAC's time on the risk, measured by the inception of its policy on January 9, 2002, and expiration on January 31, 2003, was 78.98 percent (387 days/490 days).

Under the parties' agreement to apportion damages according to each carrier's time on the risk, the court allocated the responsibility to pay the $1.1 million settlement as follows: $40,027.55 to Claremont (21.02 percent of $190,426) and $1,059,972.45 to NAC ($909,574 plus 78.98 percent of $190,426, i.e., $150,398.45). Because NAC paid only $800,000 in settlement on JDG's behalf, and Claremont had contributed $300,000, the court determined NAC was not entitled to obtain any further contribution from Claremont.

## 5. *Posttrial Motions*

NAC timely submitted its objections to Claremont's proposed statement of decision on March 28, 2007, within the time the court had allowed. However, the trial court issued a statement of decision and entered judgment before the expiration of NAC's time to submit objections.

NAC filed a motion for a new trial and a motion to set aside the judgment and requested entry of a different judgment. The trial court considered and overruled NAC's objections to the court's statement of decision and denied both motions. In denying the motions, the trial court acknowledged that NAC's objections to Claremont's proposed statement of decision was timely and the court had acted prematurely. The court therefore reviewed and considered NAC's objections, but then concluded its decision remained the same.

NAC timely appealed from the judgment.

## STANDARD OF REVIEW

We apply settled doctrines in reviewing NAC's contentions. Interpretation of an insurance policy is a question of law that we review de novo. (*Powerine Oil Co., Inc. v. Superior Court* (2005) 37 Cal.4th 377, 390 [33 Cal.Rptr.3d 562, 118 P.3d 589]; *AIU Ins. Co. v. Superior Court* (1990) 51 Cal.3d 807, 818 [274 Cal.Rptr. 820, 799 P.2d 1253].) Notwithstanding that insurance policies have special features, they are still contracts, to which ordinary rules of contractual interpretation apply. (*Bank of the West v. Superior Court* (1992) 2 Cal.4th 1254, 1264 [10 Cal.Rptr.2d 538, 833 P.2d 545].) The fundamental objective of contractual interpretation is to give effect to the

mutual intention of the parties. (*Ibid.*; see Civ. Code, § 1636.) If possible, that intent should be inferred solely from a contract's written provisions. (Civ. Code, §§ 1638, 1639; *AIU Ins. Co. v. Superior Court, supra*, at p. 822.) The "clear and explicit" meaning of the contractual provisions (Civ. Code, § 1638), interpreted in their "ordinary and popular sense" (Civ. Code, § 1644), governs judicial interpretation (Civ. Code, § 1638), unless the words are "used by the parties in a technical sense" or a "special meaning" is given to them by usage (Civ. Code, § 1644). (See *Bay Cities Paving & Grading, Inc. v. Lawyers' Mutual Ins. Co.* (1993) 5 Cal.4th 854, 867 [21 Cal.Rptr.2d 691, 855 P.2d 1263]; *AIU Ins. Co. v. Superior Court, supra*, at p. 822.) If a layperson would ascribe to the contract language a meaning that is not ambiguous, we apply that meaning. (*AIU Ins. Co. v. Superior Court*, at p. 822.)

We review the trial court's factual findings for substantial evidence. (*Foreman & Clark Corp. v. Fallon* (1971) 3 Cal.3d 875, 881 [92 Cal.Rptr. 162, 479 P.2d 362].) We begin with the presumption that the record contains evidence to uphold every finding of fact and appellant has the burden to demonstrate there is no substantial evidence to support the findings under attack. (*Ibid.*) " 'When a finding of fact is attacked on the ground that there is not any substantial evidence to sustain it, the power of an appellate court *begins* and *ends* with the determination as to whether there is any substantial evidence contradicted or uncontradicted which will support the finding of fact.' [Citations.]" (*Ibid.*)

We review an order admitting or excluding evidence for abuse of discretion. (*People v. Waidla* (2000) 22 Cal.4th 690, 717–718 [94 Cal.Rptr.2d 396, 996 P.2d 46].) An abuse of discretion occurs when, in light of applicable law and considering all relevant circumstances, the court's ruling exceeds the bounds of reason. (*Shamblin v. Brattain* (1988) 44 Cal.3d 474, 478–479 [243 Cal.Rptr. 902, 749 P.2d 339]; *Denham v. Superior Court* (1970) 2 Cal.3d 557, 566 [86 Cal.Rptr. 65, 468 P.2d 193].)

## DISCUSSION

### 1. *The Court Properly Determined the Contract Completion Date*

NAC contends the trial court disregarded Claremont's policy language in finding the home was completed, and Claremont's coverage was triggered, as of September 28, 2001, the date reflected in the notice of completion. NAC argues that paragraph 16.a.2(c) of the primary insurance policy Claremont issued to JDG included coverage for "completed operations" and that the policy contained a definition for "[p]roducts-completed operations hazard," stating, " 'your work' will be deemed completed at the *earliest* of the

following times: [¶] (a) When all of the work called for in your contract has been completed[;] [¶] (b) When all of the work to be done at the job site has been completed if your contract calls for work at more than one job site[;] [¶] (c) When that part of the work done at a job site *has been put to its intended use* by any person or organization other than another contractor or subcontractor working on the same project." (Italics added.)

NAC argues both of Claremont's policies defined "completed" in substantially identical language and such definition controls in determining the proper interpretation of when JDG's work for the homeowner was completed. In NAC's view, the date of completion under the policies was the date the homeowner moved into the house, i.e., no later than May 2001, when "that part of the work done at [the] job site has been put to its intended use . . . ." Although work continued at the house after the family moved in, NAC notes the definition of "completed" operations clearly provides that "your work" will be deemed completed at the *"earliest of the following times . . . ,"* the "earliest" time being when the house was put to its intended use by the family moving in. (Italics added.)

Claremont responds that the point at which a contractor has completed its work and whether a building is complete are both questions of fact. Specifically, Claremont asserts the extent to which the residence was complete as of May 2001, and thus whether the family's moving into the home in May 2001 triggered the "completed operations" coverage under the Claremont primary policy, is a question of fact to which the substantial evidence standard applies. We agree with Claremont.

The point at which a job site has been put to its intended use is a question of fact to be determined under the conditions and circumstances of each case. (See *Hammond Lumber Co. v. Yeager* (1921) 185 Cal. 355, 358 [197 P. 111] [issue whether work complete is issue of fact not law]; *Lewis v. Hopper* (1956) 140 Cal.App.2d 365, 367 [295 P.2d 93] ["words 'completion of the contract' should be given their ordinary meaning" in nonmechanics lien cases]; *Nevada County Lumber Co. v. Janiss* (1938) 25 Cal.App.2d 579, 582–583 [78 P.2d 200] [completion of building question of fact, and appellate court may not interfere in determination when substantial evidence supports finding].)

The trial court determined as a question of fact that the residence was not "put to its intended use" until the date reflected in the notice of completion, September 28, 2001. This is a reasonable finding under the defined terms of Claremont's primary and umbrella policies. It is logical that a residence might be partially inhabited prior to the date of completion, and not yet be put to its "intended use" because the owner does not have full use of the facilities. The homeowner testified that work continued well past May 2001

and went on for a year after that. The city inspector testified that even though a residence may receive a certificate of occupancy, it did not necessarily indicate the dwelling was habitable and typically interior painting and carpeting or other flooring materials have yet to be installed. The homeowner's agent executed the notice of completion certifying the "work of improvement on the property" was completed on September 28, 2001. JDG's president stated that JDG paid the owner liquidated damages from May 2001 to September 30, 2001, because the residence had not been timely completed. It is reasonable to infer from all the evidence that JDG substantially completed the work under the contract by September 28, 2001, so that the residence could be "put to its intended use," but that additional work remained to be done under the contract beyond that point so that not "all of the work called for in [the] contract" was completed. The trial court's finding is reasonable and well supported by the evidence.[8]

## 2. The Contractors Warranty Endorsements Are Enforceable

We disagree with NAC's contention that the contractors warranty endorsements contained in Claremont's primary and umbrella policies are unenforceable.

NAC initially asserts the contractors warranty endorsements in the Claremont policies are ambiguous. NAC complains that Claremont argued, and the trial court ruled, that the endorsements were preconditions to coverage. NAC maintains that the endorsements were not "preconditions" to coverage but rather "exceptions" to coverage because coverage would be absent from liability associated with a subcontractor for whom there was no compliance with the endorsement, even if the subcontractor contracts were signed prior to the inception of the insurance policy.

In *Scottsdale Ins. Co. v. Essex Ins. Co.* (2002) 98 Cal.App.4th 86 [119 Cal.Rptr.2d 62] (*Scottsdale*), the appellate court enforced an endorsement substantially similar to the endorsements at issue in this case, finding the special condition endorsement to be unambiguous and therefore enforceable. In *Scottsdale*, the insured, a licensed architect and general contractor, built a large single-family residence purchased by the Operas. (*Id.* at p. 88.) The

---

[8] Because we conclude the trial court properly found as a matter of fact that the date that triggered Claremont's coverage was the date of the notice of completion, we need not address NAC's further contention that the court erred in ruling NAC was alternatively estopped from asserting the notice of completion date did not apply because NAS denied JDG's tender of defense to CUIC on the basis of the September 28, 2001 notice of completion date. We therefore need not discuss Claremont's assertion that the trial court's application of the doctrine of equitable estoppel to bind NAC to the position taken by NAS regarding the trigger of completed operations coverage was within the trial court's discretion.

final inspection was completed in April 1991, and the Operas purchased the home in October 1991. Within months, water began to infiltrate the home, and, several years later, sewage spilled in and under the home due to a failed pump, leading to a buildup of mold. (*Id.* at p. 89.) The Operas filed a claim against the insured. The insured in turn referred the claim to his insurers. Essex Insurance Company provided comprehensive general liability insurance to the insured from February 15, 1991, to March 21, 1993, and Scottsdale Insurance Company provided such insurance from March 21, 1993, through April 20, 1994.

Essex denied the claim, but Scottsdale accepted the insured's tender of defense, settled with the Operas and then sought equitable contribution from Essex. (*Scottsdale, supra*, 98 Cal.App.4th at p. 89.) The Essex policy of insurance contained a special condition endorsement, similar to the endorsement in the present case, requiring that the insured (1) obtain certificates of insurance from all subcontractors, (2) obtain hold harmless agreements from all subcontractors indemnifying the insured against all losses for work performed, and (3) ensure that it was named as an additional insured on all subcontractor general liability policies. (*Id.* at p. 89.)

The trial court in *Scottsdale* refused to enforce the special condition endorsement, finding the endorsement essentially rendered the policy illusory, was analogous to an unenforceable escape clause, was ambiguous and conflicted with an "other insurance" clause in the Essex policy. The trial court also found Essex was not prejudiced by the lack of compliance with the condition and that its enforcement would violate the spirit of the condition since the insured did obtain other insurance to help cover any loss. (*Scottsdale, supra*, 98 Cal.App.4th at pp. 90, 94.) The appellate court reversed. (*Id.* at p. 98.)

The appellate court in *Scottsdale* held that the endorsement did not render the policy illusory, because the parties exchanged promises that represented legal obligations: if the insured satisfied the condition of the special condition endorsement, i.e., required his subcontractors to obtain insurance naming him an insured, then Essex was required to participate with those insurers in defending or indemnifying the insured. (*Scottsdale, supra*, 98 Cal.App.4th at pp. 94–95.) As so interpreted, the court held the Essex policy was not illusory. (*Id.* at p. 95.) The appellate court also held the endorsement was not analogous to a disfavored escape clause, because the endorsement was merely a condition precedent to coverage, not a clause that eliminated coverage in the presence of other insurance. (*Ibid.*) Nor did the appellate court find the endorsement ambiguous. The requirements were clearly set forth, and "[t]he endorsement plainly states that meeting those requirements is a condition of coverage." (*Ibid.*) The insured clearly was required, as a condition of

coverage, to obtain certificates of insurance from all subcontractors, to obtain hold harmless agreements from subcontractors against all loss for the work performed, and to make certain the insured was named as an additional insured on all subcontractors' liability policies. (*Id.* at p. 95.)

■ We reject NAC's argument that the conditions contained in the endorsements in this case were not spelled out conspicuously, plainly or clearly in the policy. (See *Haynes v. Farmers Ins. Exchange* (2004) 32 Cal.4th 1198, 1204 [13 Cal.Rptr.3d 68, 89 P.3d 381] ["to be enforceable, any provision that takes away or limits coverage reasonably expected by an insured must be 'conspicuous, plain and clear' "].) The condition to coverage under the contractors warranty endorsement in both the primary and umbrella Claremont policies could not have been more conspicuous or more clearly spelled out. The contractors warranty endorsements in the Claremont policies are substantially identical to the policy provisions in *Scottsdale* and are enforceable for the same reasons expressed in that case.

Moreover, we find the contractors warranty endorsements in this case to be conspicuous, plain and clear. The Claremont primary policy provision contains conspicuous references to "Forms Applicable to All Coverage Forms" on the pages listing the premium and limits of insurance, announcing, "Forms List Attached." This reference appears on the first page, directly under the statement that "[i]n return for the payment of the premium, and subject to all the terms of this policy, we agree with you to provide the insurance as stated in this policy." The reference also appears on the second and third pages of the policy, which reflect the amounts of premium and limits of insurance. The forms list itself appears on the fourth page of the policy and includes a reference to a "Contractors Warranty Endorsement." The contractors warranty endorsement is included as a separate page attached to the policy, together with other policy exclusions and endorsements. The contractors warranty endorsement is equally prominent and conspicuous in the Claremont umbrella policy.

■ The language of the endorsements also clearly indicates the endorsement is a condition to coverage rather than an exclusion from coverage. The endorsements read: "In consideration of the premium charged, it is hereby understood and agreed that such coverage as is afforded by this policy *shall not apply* to operations performed by independent contractors *unless* . . . ." (Italics added.) This provision patently is in the nature of a condition *precedent* to coverage, not an exclusion from coverage. "A condition *precedent* refers to an act, condition or event that must occur before the insurance contract becomes effective or binding on the parties . . . ." (Croskey et al., Cal. Practice Guide: Insurance Litigation (The Rutter Group 2008) ¶ 3:158, p. 3-47 (rev. # 1, 2008).) In general, "conditions neither confer nor exclude

coverage for a particular risk but, rather, impose certain duties on the insured in order to obtain the coverage provided by the policy." (*Ibid.*)

We also reject NAC's further contention that enforcing the endorsements would violate "fundamental principals [*sic*] of California law" because they allegedly must be applied "retroactively" to contracts already signed or agreed to. NAC places much reliance on the fact the Claremont primary policy required that the "insured *has* received a written agreement . . ." and the insured "*has* obtained certificates of insurance . . . ." (Italics added.) NAC argues that Claremont purported to be selling a policy with an endorsement that purportedly would preclude coverage based on contracts and insurance arrangements already entered into, perhaps years before the inception date of the policy.

We are not troubled by this contention. *Scottsdale* also rejected a similar argument that the special condition endorsement in that case was impossible to perform, stating that "endorsements requiring general contractors to warrant that all subcontractors used will maintain insurance at specific levels, and to be named an additional insured on the subcontractors' policies, is not unusual," and such a special condition "was not impossible of performance." (*Scottsdale, supra*, 98 Cal.App.4th at p. 96.) We note many of the contracts with the subcontractors undoubtedly already would have been signed in *Scottsdale* because the Opera residence was completed in April 1991, and the Essex policy had gone into effect barely two months before, on February 15, 1991. (*Id.* at pp. 88–89.) That fact did not prevent the appellate court in *Scottsdale* from holding the endorsement enforceable.

As in *Scottsdale*, JDG knew, or is presumed to have known, of this precondition prior to acceptance of the Claremont policies. JDG could have protected itself by obtaining from its independent contractors agreements for indemnity and certificates of insurance before entering into the policy or by seeking modification of this policy term, e.g., by paying a larger premium. Indeed, JDG's president testified, and the trial court found, that it was JDG's normal practice to obtain hold harmless agreements and certificates of insurance for projects on which JDG worked.[9] Merely requiring that JDG continue its normal business practice of obtaining hold harmless agreements and certificates of insurance as a precondition to coverage did not render either the Claremont primary or umbrella insurance contractors warranty endorsements impossible of performance.

■ We find the "clear and explicit" meaning of the contractors warranty endorsements, as used in their "ordinary and popular sense" by a layperson

---

[9] The record does not reflect why JDG departed from its normal practice in embarking on the present project.

establishes a precondition of coverage as to work done by subcontractors for whom JDG failed to secure both a written hold harmless agreement and a certificate of insurance. The trial court therefore did not err in finding the contractors warranty endorsement enforceable under the facts of this case.

### 3. *The Umbrella Policy Did Not "Drop Down"*

NAC contends that, even if the contractors warranty endorsement on the primary policy applied to foreclose coverage under that policy, the Claremont umbrella policy provided alternate primary coverage. We disagree.

Initially, NAC argues that the contractors warranty endorsement under the umbrella policy required JDG to comply with the preconditions only as to those subcontracts JDG entered into after the inception of the Claremont umbrella policy, because the endorsement states the insured *"will* receive" and *"will* obtain" a hold harmless agreement and a certificate of insurance from each independent contractor. (Italics added.) The court in *Scottsdale* found the terms "will be obtained" and "will obtain" in the endorsement in that case had no temporal reference and meant simply that the insured must have satisfied the preconditions to coverage in order for coverage to apply to the claim. (*Scottsdale, supra*, 98 Cal.App.4th at pp. 93, 95–97.) We similarly interpret the terms "will receive" and "will obtain" in the Claremont umbrella policy such that the contractors warranty endorsement would apply to all times JDG sought coverage for operations performed or to be performed on its behalf by an independent contractor whether or not the subcontracts were already in existence at the policy's inception.

NAC further argues that, if this court holds the Claremont primary contractors warranty endorsement applies to the underlying litigation, then the Claremont umbrella policy "drops down" to provide coverage that is excluded in the primary policy. We disagree.

■ "Primary coverage provides immediate coverage upon the 'occurrence' of a 'loss' or the 'happening' of an 'event' giving rise to liability. [Citation.] It is defined as 'insurance coverage whereby, *under the terms of the policy*, liability attaches *immediately* upon the happening of the occurrence that gives rise to liability. [Citation.]' [Citation.] In the context of liability insurance, a primary insurer generally has the *primary* duty to defend and to indemnify the insured, unless otherwise excused or excluded by specific policy language. [Citation.] Excess insurance provides coverage after other identified insurance is no longer on the risk. 'Excess' coverage means 'coverage whereby, *under the terms of the policy*, liability attaches only after a predetermined amount of primary coverage has been exhausted.' [Citations.]" (*Fireman's Fund Ins. Co. v. Maryland Casualty Co.* (1998) 65 Cal.App.4th 1279, 1304 [77 Cal.Rptr.2d 296] (*Fireman's Fund*).)

In the present case, the Claremont umbrella policy provides two types of coverage: "Coverage A—Excess Liability Coverage" and "Coverage B—Extended Liability Coverage." Coverage A of the Claremont umbrella coverage provides Claremont "will pay those sums, in excess of the amount payable under the terms of any 'underlying insurance' [i.e., the Claremont primary policy] that the insured [JDG] becomes legally obligated to pay as damages because of injury or damage to which this insurance applies, provided that the 'underlying insurance' [i.e., the Claremont primary policy] also applies, or would apply but for the exhaustion of its applicable limits of insurance." "Coverage B—Extended Liability Coverage" states: "We will pay those sums that the insured becomes legally obligated to pay as damages because of 'injury' to which this insurance applies. This insurance applies to 'injury' which occurs during the policy period shown in the Declarations. . . ." NAC contends that the trial court should have ruled that the Claremont umbrella policy "drops down" in this case to become primary insurance. NAC states the language of Coverage B comprises a "broad" insuring provision "very similar" to a primary policy. NAC concedes that paragraph 2.a., "Exclusions," states that "[t]his insurance does not apply to: [¶] a. 'Injury' that is the subject of the insurance policies shown in the Schedule of Underlying Insurance in the Declarations [i.e., the Claremont primary policy]."

Relying on *Reserve Insurance Co. v. Pisciotta* (1982) 30 Cal.3d 800 [180 Cal.Rptr. 628, 640 P.2d 764], NAC maintains the two coverage provisions in the Claremont umbrella policy, read together, make the excess policy applicable either as excess insurance over any amounts recoverable under the primary policy or as alternative primary coverage for losses not covered by the primary policy. (*Id.* at p. 812.) We find *Reserve* distinguishable. *Reserve* relates to an excess insurer's duty to take the place of an insolvent underlying insurer. (See *Denny's, Inc. v. Chicago Ins. Co.* (1991) 234 Cal.App.3d 1786, 1792 & fn. 4 [286 Cal.Rptr. 507].) In *Reserve*, the excess insurance policy stated that " '[t]he [excess insurer] shall only be liable for the ultimate net loss in excess of . . . : . . . the *amount recoverable* under the underlying insurance . . . .' " (*Reserve, supra,* at p. 812, italics added.) The Supreme Court concluded the term "amount recoverable" under the excess policy "might possibly be interpreted either to expose [the excess insurer] only for amounts over the dollar limits of the underlying insurance or to expose [the excess insurer] for amounts which the insured is not able to actually recover from the underlying insurer because of its insolvency." (*Id.* at p. 815.) Finding the term "amount recoverable" to be ambiguous, the Supreme Court held the policy had to be construed in favor of the insured and held the excess policy included the risk of the primary insurer's insolvency within the scope of the excess insurer's coverage. (*Ibid.*) We are not dealing with an insolvent primary insurer here.

In the present case, Coverage A states Claremont will pay an amount "in excess of the amount payable under the terms of any 'underlying insurance' " *provided that* "the 'underlying insurance' [i.e., the Claremont primary policy] also applies, or would apply but for the exhaustion of its applicable limits of insurance." We have held, *ante*, that, by reason of the contractors warranty endorsement, the Claremont primary policy does not apply to cover claims for defects arising from the conduct of all but two contractors of JDG. The underlying insurance therefore did not "also appl[y]" to such uncovered claims, and the amount Claremont contributed toward settlement of the claim did not exhaust the limits of its primary policy. Coverage under the excess insurance provisions under Coverage A thus was not triggered by settlement of the underlying action.

Coverage B provides coverage for the amount JDG "becomes legally obligated to pay" as damages because of " 'injury' to which this insurance applies." However, Coverage B clearly *excludes* from its application injury that is "the subject of" the underlying primary policy. The homeowner's claim against JDG was "the subject of" the underlying Claremont primary policy, even if only a portion of the claim was covered as a result of the insured's failure to comply with the contractors warranty endorsement. These terms are clear, and there is nothing ambiguous about them. And, contrary to NAC's implication, the record indicates Claremont never acknowledged a duty to defend under the Claremont umbrella policy.

Moreover, under the California rule of "horizontal exhaustion," all primary insurance must be exhausted before an excess insurer must "drop down" to defend an insured, particularly in cases of continuing loss as occurred here. (*Padilla Construction Co., Inc. v. Transportation Ins. Co.* (2007) 150 Cal.App.4th 984, 987 [58 Cal.Rptr.3d 807] ["the rule of horizontal exhaustion applies to cases of alleged continuing property damage—as often happens when the insured is sued for construction defects"].)

The trial court therefore did not err in ruling the Claremont umbrella policy did not "drop down" to cover the losses for which there is no coverage under the Claremont primary policy.

### 4. *Sufficient Evidence Supports the Trial Court's Findings on Equitable Contribution*

NAC finally argues that even if the contractors warranty endorsements are effective to limit Claremont's coverage obligation, there was insufficient evidence for the court to determine its share of "liability." We disagree, finding substantial evidence to support the trial court's findings.

## A. *Expert Testimony Properly Admitted*

■ NAC asserts Claremont failed to submit evidence on the subcontractors' actual liability, such as the nature of the subcontractor's work, its defects and damages caused thereby. The trial court found "the allocation of relative responsibility among certain independent contractors for particular defective conditions . . . and any damage resulting from the operations performed by such independent contractor[s], is beyond the common experience of the court." Therefore, the court ruled that expert Savel's opinion testimony was admissible because it "assist[ed] the court in determining the percentage of relative responsibility of such independent contractors for damages caused by the respective operations performed by such independent contractors." Experts may testify as to matters "sufficiently beyond common experience" that the opinion of an expert "would assist the trier of fact." (Evid. Code, § 801, subd. (a).)

■ Savel gave his opinion regarding the relative percentages of responsibility of the subcontractors and testified as to the bases for his opinion. Included in such matters were reports, depositions and other information upon which he could properly rely. " '[A]n expert may generally base his opinion on any "matter" known to him, including hearsay not otherwise admissible, which may "reasonably . . . be relied upon" for that purpose.' " (*People v. Catlin* (2001) 26 Cal.4th 81, 137 [109 Cal.Rptr.2d 31, 26 P.3d 357]; see Evid. Code, § 801, subd. (b).) That the opinion expressed may have included ultimate facts to be decided by the court does not alone make such evidence improper, as "[t]estimony in the form of an opinion that is otherwise admissible is not objectionable because it embraces the ultimate issue to be decided by the trier of fact." (Evid. Code, § 805.) The trial court properly relied upon Savel's testimony regarding percentage of relative responsibility and such testimony did not usurp the court's role as trier of fact.

■ NAC states that Savel offered no evidence regarding the defects in the home, the work the subcontractor was hired to perform, the manner in which that work should have been performed and manner in which it was actually performed, the problem created by the work and the damage caused thereby. NAC notes much of the testimony would have been hearsay had Savel testified to such facts. Although Savel testified he examined such details, it was not appropriate for Savel to testify to such matters. An expert may rely on hearsay to form an opinion, but the expert should not bring before the trier of fact incompetent hearsay evidence under the guise of reasons for his opinion. (*People v. Catlin, supra,* 26 Cal.4th at p. 137.) NAC had the opportunity at trial to explore such particulars with Savel during cross-examination to show his evidence lacked credibility. But not " 'even testimony which is subject to justifiable suspicion . . . justif[ies] the reversal

of a judgment, for it is the exclusive province of the [trier of fact] to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends.' " (*Evje v. City Title Ins. Co.* (1953) 120 Cal.App.2d 488, 492 [261 P.2d 279], quoting *People v. Huston* (1943) 21 Cal.2d 690, 693 [134 P.2d 758], overruled on another ground in *People v. Burton* (1961) 55 Cal.2d 328, 352 [11 Cal.Rptr. 65, 359 P.2d 433]; see also *People v. Maury* (2003) 30 Cal.4th 342, 403 [133 Cal.Rptr.2d 561, 68 P.3d 1].)

NAC fails to show the trial court abused its discretion in admitting the expert evidence.

B.  *Substantial Evidence*

Equitable contribution is the right to recover from a co-obligor who shares a liability with the party seeking contribution. (*Fireman's Fund, supra,* 65 Cal.App.4th 1279, 1293; *Maryland Casualty Co. v. Nationwide Ins. Co.* (1998) 65 Cal.App.4th 21, 26 [76 Cal.Rptr.2d 113].) "[T]he right to contribution arises when several insurers are obligated to indemnify or defend the same loss or claim, and one insurer has paid more than its share of the loss or defended the action . . . . Equitable contribution permits reimbursement to the insurer that paid on the loss for the excess it paid over its proportionate share of the obligation, on the theory that the debt it paid was *equally* and *concurrently* owed by the other insurers and should be shared by them pro rata in proportion to their respective coverage of the risk." (*Fireman's Fund, supra,* at p. 1293.)

The application of equitable considerations must be made on a case-by-case basis, "in light of varying equitable considerations which may arise, and which affect the insured and the primary and excess carriers, and which depend upon the particular policies of insurance, the nature of the claim made, and the relation of the insured to the insurers." (*Signal Companies, Inc. v. Harbor Ins. Co.* (1980) 27 Cal.3d 359, 369 [165 Cal.Rptr. 799, 612 P.2d 889] (*Signal Companies*).)

In the absence of compelling equitable reasons otherwise, the courts should not impose an obligation on an insurer that contravenes a provision in its insurance policy. (*Signal Companies, supra,* 27 Cal.3d at p. 369; *Truck Ins. Exchange v. Unigard Ins. Co.* (2000) 79 Cal.App.4th 966, 974 [94 Cal.Rptr.2d 516].)

Courts have devised a variety of methods for determining equitable contribution between coinsurers. (*Centennial Ins. Co. v. United States Fire Ins. Co.* (2001) 88 Cal.App.4th 105, 113 [105 Cal.Rptr.2d 559] [describing "time

on the risk" method, "policy limits" method, the "combined policy limit time on the risk" method, the "premiums paid" method, the "maximum loss" method, and the "equal shares" method].) The fundamental lesson to be drawn from existing authorities is that there are no "hard and fast 'bright line' " rules for the proper method of allocating defense costs among coinsurers, which is a matter left to the sound equitable discretion of the trial court. (*Id.* at p. 112, fn. 3.) It is for the trial court to devise "the most equitable result based on the given facts and circumstances of a particular case." (*Id.* at p. 113.)

In the case at bar, the trial court found that Claremont met its burden of establishing the $1.1 million settlement payment included indemnification of the insured for damage not covered under either Claremont's primary policy pursuant to the contractors warranty endorsement or its umbrella policy. The court ruled that once Claremont established this fact the burden of proof "shifted" to NAC to allocate the settlement payment between damages covered under the Claremont primary policy and damages not covered under either of the Claremont policies. However, the court further found that even if the burden was Claremont's rather than NAC's, Claremont satisfied that burden based on the evidence presented by expert Savel. In assessing equitable contribution, the court's analysis took into account both insurers' time on the risk as well as the insured's failure to comply with the contractors warranty endorsement precondition under Claremont's primary policy. We cannot say the trial court abused its discretion in doing so.

NAC contends that even assuming the contractors warranty endorsements in this case are valid and enforceable Savel's testimony did not establish the allocation to be assigned each subcontractor and provided no direct evidence of the actual damages associated with each subcontractor. We observe that NAC made these same arguments in the trial court. Even if Savel provided no direct evidence of the damages associated with each subcontractor, his testimony constituted sufficient evidence from which the court could make an allocation of damages under the third party policies.

NAC asserts the trial court improperly relied on *Golden Eagle Refinery Co. v. Associated Internat. Ins. Co.* (2001) 85 Cal.App.4th 1300 [102 Cal.Rptr.2d 834] (*Golden Eagle*) in ruling NAC had the burden to allocate between covered and uncovered claims. NAC states *Golden Eagle* has never been cited by any appellate court as applying to equitable contribution between insurers. We note the California Supreme Court has recently disapproved of *Golden Eagle* in the case of *State of California v. Allstate Ins. Co.* (2009) 45 Cal.4th 1008, 1036 [90 Cal.Rptr.3d 1, 201 P.3d 1147]. We are not required, however, to accept the trial court's legal reasons or conclusions of law because we review its ruling, not its reasoning. (*ASP Properties*

■■■

*Group, L.P. v. Fard, Inc.* (2005) 133 Cal.App.4th 1257, 1268 [35 Cal.Rptr.3d 343].) " 'If right upon any theory of the law applicable to the case, [the judgment] must be sustained regardless of the considerations which may have moved the trial court to its conclusion.' " (*Ibid.*, quoting *Davey v. Southern Pacific Co.* (1897) 116 Cal. 325, 329 [48 P. 117].)

In any case, any error by the trial court in relying upon the *Golden Eagle* case was harmless because the trial court found that even if the burden to allocate fell on Claremont and not NAC, Claremont met this burden, and, as we have explained, substantial evidence supports this finding.

The trial court did not abuse its discretion in setting the amount of Claremont's equitable contribution and, therefore, properly found NAC should recover nothing from Claremont.

## DISPOSITION

The judgment is affirmed. Claremont is to recover costs on appeal.

Rubin, Acting P. J., and Bigelow, J., concurred.